526 So.2d 147 (1988)
Timothy L. SELLERS and Kristi H. Sellers, Appellants,
v.
FRANK GRIFFIN AMC JEEP, INC., and American Credit Corp., Appellees.
No. BJ-373.
District Court of Appeal of Florida, First District.
May 17, 1988.
*148 Albert H. Mickler, Jacksonville, for appellants.
Haywood M. Ball, of Donahoo, Donahoo & Ball, P.A., Jacksonville, for appellee American Credit Corp.
J. Michael Lindell, of Cowles, Hayden, Facciolo, McMorrow & Barfield, P.A., Jacksonville, for appellee Griffin AMC Jeep.
PER CURIAM.
Appellants, Timothy and Kristi Sellers (hereinafter appellants or Sellers), took possession of a new Jeep Cherokee vehicle pursuant to a "Retail Lease Agreement" with Frank Griffin AMC Jeep, the AMC Jeep dealer in Jacksonville (hereafter Frank Griffin or Dealer). According to the complaint, several days after appellants accepted the vehicle the motor exploded, sending large portions of the engine through the engine block. After the engine was repaired, other problems began. The Jeep rattled and leaks caused flooding in the passenger compartment. The cruise control was erratic, the gauges operated improperly, and the seat covers were separating. The air conditioner did not cool, and the four-wheel drive "choked out." The brake system began to fail. Finally, after eleven months, appellants attempted to return the Jeep to Frank Griffin and revoke their acceptance of the vehicle, but the dealer refused to accept its return.
Appellants filed suit against Frank Griffin and American Credit Corporation (hereafter AMCC), assignee of the lease agreement, seeking revocation of acceptance under section 672.608, Florida Statutes (1983) (section 2-608, Uniform Commercial Code), and under 15 U.S.C.A. sections 2301-08, the Magnuson-Moss Warranty Act (Magnuson-Moss Act). No other theory of relief was alleged. Count I of the complaint as amended alleged that the lease agreement is a "transaction in goods" within the meaning of section 672.102; that appellants assumed their new vehicle would be operable and free of substantial defects, but it was not; that the Dealer had failed or was unable to correct the defects; that such defects are nonconformities and constitute a breach of implied warranty; and that such breach substantially impaired the value of the vehicle. Count II alleged that the Dealer made certain written warranties and breached both express and implied warranties in violation of the Magnuson-Moss Act. In addition to revocation of acceptance, appellants sought refund of the down payment and all monies paid to AMCC, as well as consequential damages. The action based on the Magnuson-Moss Act also claimed statutory attorney's fees.
The trial court granted summary judgment on the sole ground that the subject transaction is a closed-end lease, not a sale, and that both section 672.608 and the Magnuson-Moss Act apply only in the case of a sale. The court relied principally upon the terms of the agreement requiring that appellants return the vehicle to the lessor or its assignee at the end of the forty-eight month term with no option to purchase, and the express provision in the lease that the transaction was a lease only and the lessor remained owner of the vehicle. The court ruled that neither section 672.608 nor the Magnuson-Moss Act applies to a closed-end lease where there is no present or anticipated transfer of title from the supplier to *149 the consumer because title had to pass for a sale to have occurred. The appealed order states that plaintiffs neither bought nor contracted to buy goods within the meaning of section 672.103, Florida Statutes (1983), and that section 672.608, Florida Statutes (1983), is "inapplicable to a pure lease contract where the lessees have no right to purchase the goods at any time in the future." The trial court noted the decision in Capital Associates, Inc. v. Hudgens, 455 So.2d 651 (Fla. 4th DCA 1984), in which the court held that the lease of personal property was a transaction in goods within the meaning of section 672.102 subject to the prohibition against unconscionable clauses found in section 672.302. The trial court distinguished Capital Associates because section 672.302 is not limited by its terms to a sale involving the relationship of buyer and seller, as is section 672.608. The court stated that "this case is distinguishable from Capital Associates in that it falls within the language of the phrase, `unless the context otherwise requires,' of Section 672.102... ." The trial court declined to address the merits of the existence of a written warranty as alleged in count II and whether the disclaimers in the lease agreement operated to defeat appellants' right to relief, saying the latter would be a defensive issue.
The critical issues on this appeal are whether the lease transaction shown by this record is, as a matter of law, not subject to either section 672.608 or the Magnuson-Moss Act because the transaction did not amount to a sale transaction within the meaning of those two statutes. The facts before us present a very appealing case for extending the provisions of both statutes to this lease transaction, but for the reasons hereafter discussed we believe this is more properly a legislative function and affirm.

UNIFORM COMMERCIAL CODE
The UCC provisions for revocation of acceptance contained in section 672.608 read in part:
(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it:
(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
There is ample precedent for the buyer of a new automobile to revoke acceptance under this section of the UCC if the vehicle manifests numerous defects after the buyer's acceptance, the defects are not satisfactorily repaired by the dealer or manufacturer within a reasonable time, and such defects substantially impair the value of the vehicle to the buyer. E.g., Tom Bush Volkswagen, Inc. v. Kuntz, 429 So.2d 398 (Fla. 1st DCA 1983); Orange Motors of Coral Gables v. Dade County Dairies, 258 So.2d 319 (Fla. 3d DCA), cert. denied, 263 So.2d 831 (Fla. 1972). In the latter case the court succinctly described the reasonable expectations of one who purchases a new car:
As stated in the leading case of Zabriskie Chevrolet, Inc. v. Smith, [99 N.J. Super. 441, 240 A.2d 195 (1968)], every buyer has the right to assume his new car, with the exception of minor adjustments, will be "mechanically new and factory furnished, operate perfectly, and be free of substantial defects" especially in view of the high powered advertising techniques of the auto industry.
258 So.2d at 320. Similarly, the court in Rehurek v. Chrysler Credit Corp., 262 So.2d 452 (Fla. 2d DCA), cert. denied, 267 So.2d 833 (Fla. 1972), giving a liberal construction to the UCC, reversed a judgment on the pleadings against a new car purchaser attempting to maintain a third party action for breach of warranty against a Dodge dealer and Chrysler Corporation, as *150 manufacturer. The plaintiff buyer's action was based on numerous defects discovered shortly after the vehicle was delivered which were not corrected. Despite the disclaimers contained in the retail installment sale contract, the court upheld the buyer's cause of action. The court also held that in the action brought by Chrysler Credit Corporation for a deficiency judgment against the buyer after repossession and sale of the vehicle pursuant to the terms of the installment sale contract, which had been assigned by the dealer to the closely associated Chrysler Credit Corporation, the buyer could defend the deficiency claim on the allegation that the automobile he got was not what he bargained for. The court concluded by saying:
In passing, we observe that the purchase of an automobile is not only a considerable expenditure, but in this day of mobility, a necessity. When a purchaser answers the inducements made in the tremendous advertising campaigns carried on by the automobile industry and purchases a new automobile, he has the right to expect the automobile to perform properly and as represented. If it does not, through no fault of his, it appears to us that he should be allowed to seek redress. Here, the owner states that he carried the automobile back to the seller at least six times to have the necessary repairs made. The dealer attempts to refute this by saying that upon at least two occasions he did not have an appointment with the service department. We doubt seriously if the dealer required an appointment when the purchaser sought to purchase the automobile.
After a thorough study of the financial transaction involved in this business, we do not believe this opinion will in any way obstruct the free flow of commerce. We do not anticipate that we are placing an undue burden upon the automobile industry in requiring them to shoulder the responsibility of making sure their products perform as they have been represented.
262 So.2d at 456.
We have no doubt that appellant Sellers held the same expectations when he leased this vehicle from the dealer. Since Florida recognizes a strong public policy of liberally construing the provisions of the UCC to provide meaningful remedies to purchasers of defective new cars, we consider the construction of section 672.608 in the context of the transaction before us to determine whether the remedy provided under that section may be made available to appellants.
Appellants argue that section 672.608 is applicable to this lease transaction because section 672.102, defining the scope of application of chapter 672 governing sales, provides that "unless the context otherwise requires, this chapter applies to transactions in goods," and appellants' lease of this vehicle was a "transaction in goods" as so defined. By its express terms, chapter 672 applies to "sales" and section 672.608 applies to transactions involving a "buyer" and a "seller." Section 672.103 defines "buyer" as "a person who buys or contracts to buy goods," and defines "seller" as "a person who sells or contracts to sell goods." Section 672.106(1) defines "contract" and "contract for sale":
In this chapter unless the context otherwise requires "contract" and "agreement" are limited to those relating to the present or future sale of goods. "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (s. 672.401). A "present sale" means a sale which is accomplished by the making of the contract.
(Emphasis added.)
It is readily apparent, therefore, that "passing of title from the buyer to the seller" is an essential element of a "sale". Appellants further argue that these definitions must be read in light of the requirements in section 671.102(1) that the code be "liberally construed and applied to promote its underlying purposes and policies" defined in subsection (2) as being "(a) To simplify, clarify and modernize the law *151 governing commercial transactions; (b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties; (c) To make uniform the law among the various jurisdictions."[1]
Florida courts have observed this directive in holding that leases of equipment may be "transactions in goods" within the definition in section 672.101 for the purpose of applying section 672.302, Capital Associates, Inc. v. Hudgens, 455 So.2d 651 (Fla. 4th DCA 1984) (unconscionable contracts), and applying section 672.316, Xerographic Supplies Corp. v. Hertz Commercial Leasing Corp., 386 So.2d 299 (Fla. 3d DCA 1980) (exclusion or modification of warranties). In other states, certain lease transactions found by the courts to possess essential characteristics that are equivalent to a sale have been held subject to part 2 (Sales) of the UCC. See, e.g., Barco Auto Leasing Corp. v. PSI Cosmetics, 125 Misc.2d 68, 478 N.Y.S.2d 505, 511, (N.Y.City Civ.Ct. 1984); Lousin, Heller & Co., et al. v. Convalescent Home, et al.: Leases, Sales and the Scope of Article Two of the U.C.C. in Illinois, 67 Ill.B.J. 468, 473 n. 43 (citing seventeen cases where article 2 of the UCC has been applied to lease transactions).
No Florida case coming to our attention has discussed what factors must be present or what criteria must be satisfied to legally treat a lease transaction as a sale under the UCC. Courts from other jurisdictions, however, have found the following factors relevant to that determination: (1) Whether the total amount of rental payments is sufficient to amortize the value, with interest, of the object being rented; (2) whether the term of the lease covers the useful life of the object, so that the object has no residual value at the end of the lease; (3) whether there is an option to purchase the object at the end of the lease for a nominal price, or an option to continue the lease on rental terms favorable to the lessee; (4) whether the lessee is responsible for such incidents of ownership as insurance coverage, repairs, and replacement of parts; (5) whether the lessee bears the risk of damage to or loss of the object; (6) the nature of the lessor's business, i.e., whether the lessor normally sells rather than leases the object in question, and whether the lessor normally acts as a financing agency; (7) whether the lessee paid a sales tax on the transaction and is required to pay all other taxes incident to the ownership of the equipment; (8) whether the lessee is required to pay all license fees for the operation of the equipment; (9) whether the agreement permits the lessor to accelerate the payment of rent on default by the lessee and grants remedies similar to those of a mortgagee; and (10) whether the lessee is required to pay a substantial security deposit in order to obtain the equipment. E.g., Redfern Meats, Inc. v. Hertz Corp., 134 Ga. App. 381, 215 S.E.2d 10 (1975); All-States Leasing Co. v. Bass, 96 Idaho 873, 538 P.2d 1177 (1975); KLPR TV, Inc. v. Visual Electronics Corp., 327 F. Supp. 315 (W.D.Ark. 1971), aff'd in part, rev'd in part, 465 F.2d 1382 (8th Cir.1972). Compare U.C. Leasing, Inc. v. Barnett Bank of West Fla., 443 So.2d 384 (Fla. 1st DCA 1983), rev. dismissed, 447 So.2d 888 (Fla. 1984); In re Brookside Drug Store Inc., 29 U.C.C.Rep. Serv. (Callaghan) 230, 234-35 (Bankr.D. Conn. 1980); In re Pacific Sunwest Printing, 30 U.C.C.Rep.Serv. (Callaghan) 39, 44-45 (Bankr.S.D.Cal. 1980) [each listing factors the court will consider in determining whether UCC article 9 (secured transactions) will apply to a lease transaction]. We conclude, therefore, that an equipment lease may be a "transaction in goods" subject to the provisions of chapter 672 if the requisite incidents of a sale are present "unless the context otherwise requires." Section 672.102, Florida Statutes.
*152 The record before us contains a document, identified in the affidavit of Franklin Griffin as president of the dealership, which bears the title "Retail Buyer's Order" and the heading "FRANK GRIFFIN  AMC  JEEP  RENAULT." The document is dated December 27, 1983, and covers a new Jeep Cherokee Chief having the same vehicle identification number as that entered on the subject lease agreement. This document reflects the name of the "purchasers" as "Timothy L. Sellers or Kristi H" and the base price of the vehicle as $14,314.06, inclusive of equipment, accessories, freight or other charges. The selling price is shown as $13,678.00. The line for "Used Car Allowance" lists $2800.00, then $3396.00, for the automobile being traded in by the purchasers. The line for "inventory maintenance cost" (which is typed, rather than entered by hand, as are the other numbers) is $88.00. The "Subtotal" line indicates $11,006.06 ($14,314.06 - 3396 + 88). After adding back $323.94, representing the payoff to the bank on the car being traded in, the "Total Finance" amount is shown as $11,330.00. The document purports to contain the signature of Timothy L. Sellers as purchaser,[2] the signature of the Dealer's salesman, and a notation reciting "accepted by" with the initials of someone apparently signing on behalf of Frank Griffin. The record does not contain direct evidence of how the "Total Finance" amount was to be paid. The record does reflect, however, that on the day following the signing of this "Retail Buyer's Order," the parties entered into the transaction reflected by the document entitled "Retail Lease Agreement," which contained the following provisions.
The printed form of "Retail Lease Agreement" contains certain handwritten entries. The document indicates in handwriting that the "Lessor (Dealer)" is "Frank Griffin AMC JEEP Inc." and that the "Lessee (Customer)" is "Timothy L. Sellers." The printed form recites that the words "I, we, me and my" mean the named lessee, the words "you and your" mean the person named as the lessor, and "AMCC" means AM Credit Corporation. The document recites in bold print, "I AGREE TO LEASE THE VEHICLE ACCORDING TO THE TERMS AND CONDITIONS CONTAINED IN THIS LEASE." The term of the lease is forty-eight months. The document identifies the vehicle by VIN number. It requires that appellants maintain insurance on the vehicle and that the policy include a loss-payable clause in favor of Frank Griffin and AMCC.
The face of the document reflects a trade-in allowance on appellants' old vehicle in the amount of $2,476.06, a refundable security deposit of $250.00, an advance monthly payment for the first month's rent of $223.82, sales tax on that rental of $11.19, for "Total Cash Charges" of $2961.13. The total of all monthly payments, including sales tax, is shown to be $11,283.36 (an amount quite close to the purchase price on the Retail Buyer's Order previously discussed). The document is signed by Timothy L. Sellers and Kristi H. Sellers, as lessees, and contains the recitation, "I agree that I received a completely filled-in copy of this Lease on Dec. 28, 1983." Timothy Sellers also signed a statement that he had received and examined the described vehicle and that it "is in good operating order and condition and is as described."[3]
One of the two copies of the lease in the record shows that it was assigned by Frank Griffin AMC-Jeep to AM Credit Corporation on December 28, 1983, "according to the terms of the Assignment on the reverse hereof." Those terms, appearing in small print, read:
When this Lease is signed by me [Sellers] and you [Dealer], you will assign it to AMCC. I [Sellers] must then make all payments under this lease to AMCC. I *153 agree that AMCC will not have to make any repairs to or maintain the vehicle, get any insurance or perform any other service that you have agreed to perform under this Lease. I will look only to you for these services.
The printed form also contains other terms and conditions on the back in small print under the title "Additional Provisions." Under the heading "Maintenance, Repairs and Operating Expenses," the document makes appellants completely responsible for all maintenance and repair, and obligates them to return the vehicle at the end of the lease term in good condition without "excessive wear and tear," which term is defined with particularity.[4] Under the heading "Warranty" is the recitation, "Under this lease, however, there is no warranty, either expressed or implied, as to the merchantability, suitability or fitness for purpose of the vehicle."[5] The printed document recites that "[t]he vehicle will be titled in the name of AMCC."[6] Certain limitations on use of the vehicle, e.g., that it will not be used for illegal or improper purposes or for hire, etc., are set forth. Under the heading "Ownership," the document recites: "This is a lease only and you will remain the owner of the vehicle. I will not transfer, sublease, rent, or do anything to interfere with your ownership of the vehicle."[7]
The section entitled "Default" defines that term with particularity,[8] and provides that "you [Dealer] will have the rights and remedies provided by law." This section further states, "You [Dealer] will have the right to terminate the Lease and take the vehicle without demand" and contains repossession provisions customarily found in security agreements such as conditional sales contracts, mortgages, etc.[9] The document *154 provides that appellants will indemnify Frank Griffin and AMCC from loss or damage to the vehicle, and from claims, losses, and costs arising from the use of the vehicle.
The section headed "Lease Only  No Option to Purchase" contains this recital: "I agree that this agreement is one of lease and not of sale. There is no option for me to purchase the vehicle." The affidavit of Timothy Sellers contends, nevertheless, that the agreement was supposed to have an option to purchase at the end of the lease period. The document further recites, under the heading "Return of the Vehicle," that appellants will return it to the dealer at the end of the term in good condition, or to such other place as AMCC may direct, and pay any amounts still owed under the lease. The transaction obviously contemplates that the vehicle will have some residual value at the end of its term and may be resold by the dealer. Although the agreement contains no option to purchase, nothing recited in the agreement precludes appellants from purchasing the vehicle from Frank Griffin or AMCC at the end of the term by paying the vehicle's reasonable residual value.
Finally, at the bottom of the back page, there appears the following notice in large, bold print:

NOTICE REQUIRED BY FEDERAL LAW
NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.
This recitation identifies this transaction as a financing arrangement wherein AMCC is financing appellants' acquisition of the vehicle by lease.
Timothy Sellers' affidavit recites that upon arriving at the dealership he was shown various brochures and a videotape presentation exhibiting the Jeep's operating characteristics, safety features, and reliability on the highway and in rough terrain. These representations are said to have induced him to purchase the vehicle.
Nothing in this record indicates that Frank Griffin was anything other than a normal automobile dealer selling and leasing cars manufactured by AMC Jeep. It is reasonable to infer from this record that the Dealer was intent on disposing of the Jeep vehicle appellants wanted to acquire, and cared not whether it did so by a direct sale to appellants financed through AMCC or by a transaction structured as a lease, with the assignment of title to AMCC who would receive the lease payments. In either event, Frank Griffin was acting as an authorized dealer in a transaction resulting in the disposition of the vehicle it had purchased wholesale from the manufacturer which carried the warranties offered by the manufacturer as well as the warranties imposed by law on the manufacturer and the dealer as its authorized representative.
Comparing the facts in this case with the factors discussed above, it appears that some suggest this transaction should be characterized as a sale and thus subject to section 672.608, but others indicate the transaction is only a lease and not a sale. First, the total amount of rental payments appear to be sufficient to amortize most of the vehicle's value, with interest. The total of all rental payments is approximately the same amount as the purchase price of the vehicle shown on the retail buyer's order, but the vehicle was expected to have some residual value at the end of the forty-eight *155 month term. Second, the lease covers most of the useful life of the vehicle, but not all. Third, there is no option to purchase in the lease agreement. Despite appellants' contention in their affidavit that such a provision was supposed to be in the agreement, the signed document clearly reflects no such intention. The agreement does not preclude appellants from purchasing the vehicle at the end of its term, but that would be a new and different transaction to be agreed on in the future. Fourth, appellants are made responsible for the incidents of ownership such as insurance coverage, repairs, and replacement parts. Appellants are obligated to insure and maintain the vehicle at least as extensively as if they had purchased it outright, if not more so. Fifth, appellants are to bear the risk of damage or loss. Sixth, the nature of the business of Frank Griffin, the lessor, is apparently to sell and to lease vehicles. In this case it leased the vehicle and put title to it in AMCC, which normally acts as a financing agency for sales and lease transactions. Seventh, appellants are required to pay sales taxes and other taxes incident to ownership, but the sales taxes are to be paid each month on the rental amount rather than in a lump sum on the initial purchase price. Eighth, appellants are required to pay all license fees to operate the vehicle, including the title-transfer fees to put the title in AMCC. Ninth, the agreement permits lessors to accelerate the payment of rent on default by lessee and grants remedies similar to those of a mortgage or other security instrument. Tenth, appellants are required to pay a refundable security deposit of $250-plus. In addition, however, a non-refundable net value of $2,476.06 was given to appellants at the outset of the lease for appellants' old car traded in for the Jeep.
In concluding that this transaction did not constitute a sale subject to the UCC, the trial court primarily relied on the absence of an option to purchase and the consequent lack of passage of title. The absence of an option to purchase, however, does not necessarily preclude a finding that a lease is sufficiently analogous to a sale to be governed by the sales provisions of the UCC. Uniflex, Inc. v. Olivetti Corp. of America, 86 A.D.2d 538, 445 N.Y.S.2d 993 (N.Y. App. Div. 1982); Barco Auto Leasing Corp. v. PSI Cosmetics, 125 Misc.2d 68, 478 N.Y.S.2d 505, 510 (N.Y.City Civ.Ct. 1984); see Hill v. Bentco Leasing, Inc., 288 Ark. 623, 708 S.W.2d 608 (1986) (absence of option to purchase not conclusive in determining whether a transaction is a sale or a lease for purposes of law against usury). Section 671.201(37), in defining security interest, expressly discounts the notion that the absence of an option to purchase in the lease necessarily would preclude a finding that the transaction is intended to be a security transaction. On the other hand, nothing in the agreement of the parties or other facts before us will support an inference of the passing of title to the lessees at any time.
On balance, we perceive no error in the trial court's ruling on this issue. There is no basis in the facts for satisfying the UCC definition of sale in terms of a transfer of title to appellants. The parties used clear, unambiguous language in the written agreement to state that this was a lease and not a sale, and they are bound by the language so used "no matter how disadvantageous that language later proves to be." Security First Federal Savings & Loan v. Jarchin, 479 So.2d 767, 770 (Fla. 5th DCA 1985), rev. denied, 488 So.2d 831 (Fla. 1986).[10] The legal incidents of a lease vary significantly from those of a sale, and the parties' unambiguous expression of intent to create only a lease cannot be overturned by this court through legal recharacterization of the transaction. This expression of intent places this transaction squarely within the language of section 672.102 specifying "unless the context otherwise requires." To treat this transaction as a sale by analogy by indulging a very *156 liberal construction of the statutory language, as appellants request, would require that we effectively amend the applicable statutory provisions. Transactions like this one obviously should be made subject to the UCC provisions for revocation of acceptance when a defective vehicle is delivered pursuant to either a sale or a long term lease. Nevertheless we must leave this solution to the legislature.
The section of the code involved in Capital Associates, Inc. v. Hudgens, 455 So.2d 651, section 672.302, prohibiting unconscionable clauses, is not expressly limited to a buyer and seller as is section 672.608. The transaction in Xerographic Supplies Corp. v. Hertz Commercial Leasing Corp., 386 So.2d 299, was clearly a sale-security transaction and was so characterized by the court. Both cases are, therefore, readily distinguishable.

MAGNUSON-MOSS WARRANTY ACT
Much the same analysis is applicable in determining whether this is a consumer transaction which constitutes a "sale" under the Magnuson-Moss Act. By its terms the Magnuson-Moss Act applies to a "supplier" and "a buyer (other than for purposes of resale) of any consumer product" and certain qualified nonbuyers. The term "supplier" is defined in section 2301(4) to mean "any person engaged in the business of making a consumer product directly or indirectly available to consumers." The term "warrantor" is defined in section 2301(5) to mean "any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty." Section 2301(3) states:
The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

(Emphasis added.)
Appellants argue that the language emphasized above covers them whether the transaction be treated as a lease or a sale, but the law seems to be clear that there must be an identifiable purchase and sale before the provisions of the Magnuson-Moss Act apply.
We agree that the Magnuson-Moss Act seeks to provide adequate warranty protection to consumers acquiring goods from broadly defined suppliers, but it speaks in terms of an initial sale to a buyer in which warranties are made by the seller, and as such, it does not apply to a pure lease of automobiles or other consumer goods unless the lease bears a significant relationship to an actual purchase and sale. See Barco Auto Leasing Inc. v. PSI Cosmetics, 125 Misc.2d 68, 478 N.Y.S.2d 505 (N.Y.City.Civ.Ct. 1984). The case before us has not been shown to involve any sale by Frank Griffin incident to the lease transaction. The agreement describes the transaction as a pure lease and disavows any intent to consummate a present or future sale. The parties have cited no decisions applying the Magnuson-Moss Act to a pure lease transaction absent a related sale, and we believe it would amount to judicial legislation for us to so extend the coverage of the act. Obviously, in today's market place, a compelling case can be made for applying the principles of the Magnuson-Moss Act to transactions of the type before us, but that remains a matter for legislative decision.
AFFIRMED.
SHIVERS, ZEHMER and BARFIELD, JJ., concur.
NOTES
[1] Appellants also quote from the Official Code Comment to section 671.102(1) and (2):

Subsections (1) and (2) are intended to make it clear that:
This Act is drawn to provide permanent flexibility so that since it is intended to be a semi-permanent piece of legislation, it will provide its own machinery for expansion of commercial practices. It is intended to make it possible for the law embodied in this Act to be developed by the Courts in light of unforeseen and new circumstances and practices.
(Appellants' Brief, p. 10.)
[2] The affidavit of Timothy Sellers disputes that this is his signature.
[3] The affidavit of Timothy Sellers stated that before accepting possession of the Jeep he reviewed the "Pre-Delivery Inspection Checklist." That checklist had been completed by an employee of the Dealer during the predelivery inspection and service performed by the dealership.
[4] The lease agreement provides:

Excessive wear and tear includes, among other things: (i) glass breakage, (ii) repairs to body, fenders, metal work and trim, (iii) missing wheel covers, (iv) rips, tears, stains and burns to seats, seat backs, headlining, door panels or carpeting, (v) tires, including spare tire, in an unsafe condition and unsuitable for resale with less than approximately 1/8" tread remaining, (vi) any major overhaul necessary for the engine or drive train, (vii) vehicle in unsafe, abnormal operating condition, (viii) all safety and emission control equipment not in proper working order; plus (ix) any other defects or damage which you would have to tell prospective purchasers about.
(Emphasis added.)
[5] This disclaimer further states that it means "that there is no promise that the vehicle will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which a vehicle is used."
[6] This condition further provides that "[i]t will be registered as directed by AMCC. I [Sellers] will pay the title and registration costs."
[7] It should be noted that the "Warranty and Maintenance Guide" attached to the amended complaint (and presumably given to appellants when they took possession of the Jeep) is stamped by Frank Griffin in the "Authorized Selling Dealer Stamp" box and identifies Timothy Sellers as the "Owner." This guide recites in part:

THANK YOU FOR PURCHASING A 1984 JEEP VEHICLE.
This Warranty and Maintenance Guide was prepared to acquaint you with the warranty coverage associated with your new 1984 Jeep vehicle. It includes the features and benefits of the 1984 Jeep Limited 12-Month/12,000 Mile Warranty, the 1984 Jeep Powertrain Protection Limited Warranty and a number of other warranties designed to help you protect your new vehicle investment.
This Guide also contains important information covering the care and maintenance of your vehicle, including required and recommended maintenance schedules, a detailed explanation of each scheduled maintenance operation and maintenance needs.
[8] This provision provides:

"I [Sellers] will be in default if any of the following occur:
1. I do not make a payment when due;
2. I fail to comply with any of the conditions of this Lease;
3. I am the subject of a proceeding in bankruptcy, receivership or insolvency or I make an assignment for the benefit of creditors;
4. I fail to comply with the insurance requirements of this Lease.
5. I have made any material misrepresentation in my application for lease.
6. I fail to answer traffic summons or pay fines when due.
[9] The document further provides:

To take it, you [Dealer] may enter the premises where the vehicle is stored and remove it. You may take any property in the vehicle at the time of repossession and hold it for me. The retaking of the vehicle by you does not release me from any obligation under this Lease.
You or AMCC will then sell the vehicle at wholesale in a commercially reasonable manner. The amount received from this sale, less allowed expenses, plus any security deposit will be subtracted from the total of the unpaid Total Monthly Payments plus the amount the vehicle is expected to be worth at normal lease termination (residual value). If there is a balance still due, I will pay this amount and any other amounts owed under this Lease at once. Any surplus will be kept by you as owner of the vehicle.
[10] Although Sellers' affidavit claims there was supposed to be an option to purchase, this self-serving contention was made long after the lease was signed, and appellants have not alleged that their signature on the lease was obtained by fraud nor have they sought to have the terms of the lease reformed.