The Honorable Mike Beebe State Senator 211 W. Arch Ave. Searcy, AR 72143-5331
Dear Senator Beebe:
I am writing in response to your request for my opinion on various questions relating to a proposal that an Arkansas county lease a jail facility from a private contractor and contract with the Arkansas Department of Corrections to house a guaranteed minimum number of DOC inmates. You have summarized the proposal as follows:
 A private contractor would build a jail at its sole expense and would lease the facility to an Arkansas county. The monthly rental would be based upon a percentage of gross revenues derived from the operation of the facility. The lease would have a primary term equal to the maximum term for which an Arkansas county can contractually obligate the county, with multiple options to renew the lease for additional renewal terms, each renewal term being equal to the maximum term for which an Arkansas county can contractually obligate the county. The lease would provide that in the event the county failed to renew the lease at the end of the primary term or any of the renewal terms, it would be required to purchase the facility and the purchase price would be in an amount sufficient to at least retire any indebtedness the private contractor might incur to construct the facility. Upon payment of the purchase price, the private contractor would transfer the title of the facility to the Arkansas county. If not sooner terminated, at the end of the lease the county would acquire title to the facility for a nominal consideration.
 The jail would be sufficiently large enough to house not only pre-trial county inmates under the jurisdiction of the county but also state adult inmates provided by the Arkansas Department of Corrections (DOC) to the county pursuant to a long-term (25 year) agreement to be executed between the Arkansas county and the DOC. The agreement between the Arkansas county and the DOC would provide for a minimum per diem that DOC would pay to the Arkansas county for housing the DOC inmates with a guaranteed minimum occupancy. The agreement would also contain a provision allowing the DOC to withdraw from the agreement but only if the State legislature failed to appropriate sufficient money in the DOC annual budget to pay for the housing of DOC inmates by the Arkansas county.
You have posed the following questions with respect to this proposal:
 1. May an Arkansas county enter into a long-term (25 year) agreement with the Arkansas Department of Corrections to house inmates where the DOC would pay to the county a minimum per diem per inmate housed at a facility under the exclusive control of the Sheriff of the county?
 2. May the contract provide for minimum occupancy guaranteed from the DOC?
 3. If Arkansas law does not allow for a contract with a 25-year term, then what is the maximum term for which a county could enter into such an agreement with the DOC?
 4. May an Arkansas county enter into a lease/purchase agreement with a private contractor which builds a jail at its sole expense and leases the facility to the county?
 5. If a county may enter into such a lease/purchase agreement with a private contractor, what is the maximum term, including multiple renewal terms, for which a county may enter into such a lease?
 6. May the lease agreement require the Arkansas county to purchase the facility from the private contractor in the event the Arkansas county fails to exercise one or more of its options to renew the lease?
 7. At the ends of the lease may the private contractor transfer title to the facility to the county upon payment of a nominal amount of money?
RESPONSE
With respect to your first question, I believe the term of any such agreement would be limited to twenty years under the Corrections Cooperative Endeavors and Private Management Act (the "Act"), A.C.A. §§12-50-101 through 111. Moreover, I do not believe the state can absolve itself of responsibility by delegating "exclusive control" over inmates to a sheriff. With respect to your second and third questions, I believe a county could negotiate a minimum-occupancy guarantee for DOC inmates subject to the 20-year term restriction so long as the contract did not unconstitutionally purport to commit the legislature to appropriate funds for any period in excess of two years. With respect to your fourth question, I believe a lease-purchase agreement of the sort described might qualify as a permissible revenue bond under Ark. Const. amend. 65
if supported solely by non-tax revenues of the county. However, assuming the agreement could not be structured to comply with Amendment 65, a finder of fact might well determine that the lease-purchase agreement was actually an interest-bearing conditional sales contract in violation of Ark. Const. arts. 12, § 4 and 16, § 1. With respect to your fifth question, if the lease-purchase agreement were constitutionally authorized, I believe the DOC and the county could contractually commit themselves only for a period of twenty years, including renewals. A.C.A. § 12-50-106(d). However, this restriction does not rule out the possibility of negotiating a new contract once the original contract expires. With respect to your sixth question, I believe it would be impermissible to obligate the county to purchase the facility if it declined to commit to a lease term exceeding twenty years. Any such provision would in itself constitute a commitment beyond the statutorily authorized term. However, so long as the agreement did not constitute an impermissible conditional sales contract or obligate the parties for a term exceeding twenty years, I believe it could contain a conditional obligation to buy the facility upon expiration of the lease. Only a finder of fact could determine the permissibility of such an arrangement after reviewing the actual agreement. With respect to your final question, I believe an arrangement to purchase the facility for a nominal sum upon termination of the lease raises the constitutional concerns discussed in my response to your fourth question.
Question 1: May an Arkansas county enter into a long-term (25 year)agreement with the Arkansas Department of Corrections to house inmateswhere the DOC would pay to the county a minimum per diem per inmatehoused at a facility under the exclusive control of the Sheriff of thecounty?
Subsection 12-50-105(a) of the Arkansas Code, contained within the Corrections Cooperative Endeavors and Private Management Act (the "Act"), A.C.A. § 12-50-101 through -111 (Repl. 1999 Supp. 2001), authorizes a county and the state to contract with each other "for the financing, acquisition, construction, and operation of facilities for the housing of inmates." Insofar as the proposed agreement would be for the "operation" of the newly constructed facility, this statute would appear to authorize an agreement of the sort you propose, subject to the following temporal limitation:
 Contracts awarded under the provisions of this section, including contracts for the provision of correctional services or for the lease or use of public lands or buildings for use in the operation of state or local facilities, may be entered into for a period of up to twenty (20) years, subject to the requirement for annual appropriation of funds by each political subdivision and subject to the requirement of biennial appropriations by the state.
A.C.A. § 12-50-106(d).[1] See also A.C.A. §§ 12-27-103(b)(14) and12-27-125(b)(18) (authorizing the DOC and the Department of Community Correction (the" DCC") to contract with political subdivisions and private contractors to provide and improve corrections operations).
However, I believe the statute's biennial-appropriations provision — a term dictated by Ark. Const. art. 5, § 29, which bars appropriations for any period exceeding two years — might prove ineffective in actually conditioning the state's temporal commitment to the contract. As my immediate predecessor noted in considering a proposed lease-purchase agreement containing a clause voiding the long-term contract in the event of nonappropriation:
 [I]t is unclear how the legislature would exercise its will over the appropriation of these funds. Presumably, the funds will be paid out of appropriations of UAMS, most likely from appropriations allocated to "maintenance and operation" of the institution. Should the legislature choose to decline to appropriate funds for this contract, it would essentially have to decline to appropriate any funds for maintenance and operation to UAMS, as the lease purchase agreement requires UAMS to "exhaust all funds legally available" prior to exercising a termination based on nonappropriation. . . . It appears, in this regard, that the legislature could not place a line-item restriction in the appropriations act prohibiting the expenditure of any appropriated funds for this particular contract, as such a restriction would violate the separation of powers clause and would amount to impermissible legislative administering of an appropriation. See Arkansas Constitution, art. 4, 1 and 2, and Chaffin v. Arkansas Game Fish Commission, 296 Ark. 431, 757 S.W.2d 950 (1988). As stated in the dissent in Department of Ecology, supra (see note 2, supra), it is very unlikely that the nonappropriation clause could ever be exercised.
Ark. Op. Att'y Gen. No. 94-101 (attached). It would appear that any nonappropriation clause in a contract between the DOC and the county might generate similar difficulties.
Moreover, assuming the non-appropriation were readily available under the terms of the contract, this very availability might constitute a strong disincentive for the county to enter into the agreement. You report that in your proposal that the county would lease the facility from a private contractor for a long term at a monthly rental" based upon a percentage of gross revenues derived from the operation of the facility." I assume that the referenced" gross revenues" would be the amounts paid by the DOC to the county. It seems unlikely that either the county or the private contractor would be inclined to enter into a long-term agreement whose terms are pegged to a contract that might be revoked at any time through non-appropriation of funds.
Finally, I am troubled by your suggestion that the facility would be "under the exclusive control of the Sheriff of the county." Although the DOC and the DDC may contract with political subdivisions and private contractors to house prisoners, the DOC bears ultimate responsibility for the "care, custody, and correction" of inmates. A.C.A. §12-27-103(b)(7). See also A.C.A. § 12-27-103(b)(4)(B) (providing that legal custody of inmates transferred to the DCC shall remain in the DOC unless otherwise ordered by a court). In my opinion, these statutory provisions would obligate the DOC at the very least to monitor conditions at the facility to ensure compliance with state standards of care.
Question 2: May the contract provide for minimum occupancy guaranteedfrom the DOC?
Subsection 12-50-106(a) of the Code provides:
 The department [DOC], any regional corrections commission, and any political subdivision are authorized to enter into contracts with each other and with prison contractors for the financing, acquiring, constructing, and operating of facilities.
In my opinion, a minimum-occupancy guarantee is clearly a term relating to the "operating of facilities" and as such would be technically permissible so long as the contract through a nonappropriation clause acknowledges the truly optional power of the government to terminate the contract by cutting off funding.
Question 3: If Arkansas law does not allow for a contract with a 25-yearterm, then what is the maximum term for which a county could enter intosuch an agreement with the DOC?
 As noted in my response to your first question, A.C.A. § 12-50-106(d) limits the term of such a contract to twenty years.
Question 4: May an Arkansas county enter into a lease/purchase agreementwith a private contractor which builds a jail at its sole expense andleases the facility to the county?
At issue is whether this proposed arrangement would constitute an actual lease or a conditional sales contract subject to an interest provision — i.e., a loan. Subject to certain qualifications, a county is constitutionally barred from lending its credit or issuing any interest-bearing evidence of indebtedness. Ark. Const. arts. 12, § 4 and 16, § 1. See Brown v. City Of Stuttgart, 312 Ark. 97, 847 S.W.2d 710
(1993) (lease agreement containing an amortization schedule deemed clearly a sale in violation of Article 16, § 1). Although the ultimate determination will be one of fact that I am unequipped and unauthorized to make, the constitutional principle just stated might well bar the county from entering into what would amount to a rent-to-own arrangement with a private jail contractor.
However, as I discussed in the enclosed Ark. Op. Att'y Gen. No.2001-156, these provisions are qualified by several constitutional amendments. Amendment 65 provides in pertinent part:
 1. Any governmental unit, pursuant to laws heretofore or hereafter adopted by the General Assembly, may issue revenue bonds for the purpose of financing all or a portion of the costs of capital improvements of a public nature, facilities for the securing and developing of industry or agriculture, and for such other public purposes as may be authorized by the General Assembly.[2] Such bonds may bear such terms, be issued in such manner, and be subject to such conditions, all as may be authorized by the General Assembly; and the General Assembly may, but shall not be required to, condition the issuance of such bonds upon an election.
* * *
3. Definitions.
 (a) The term "revenue bonds" as used herein shall mean all bonds, notes, certificates or other instruments or evidences of indebtedness the repayment of which is secured by rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived from the project or improvements financed in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, from the operations of any governmental unit, or from any other special fund or source other than assessments for local improvements and taxes.
 (b) The term "governmental unit" as used herein shall mean the State of Arkansas; any county, municipality, or other political subdivision of the State of Arkansas; any special assessment or taxing district established under the laws of the State of Arkansas; and any agency, board, commission, or instrumentality of any of the foregoing.
In Harris v. City of Little Rock, 344 Ark. 95, 100-01, 40 S.W.3d 214
(2001), the court summarized the substance of Amendment 65 as follows:
 It is clear from the plain language of Amendment 65 . . . that revenue bonds may be repaid with rents, user fees, charges, or other revenues, other than tax revenues, derived from three sources: (1) the project or improvement financed by the bonds; (2) the operations of any governmental unit; or (3) any other special fund or source other than assessments for local improvement and taxes.
Only a finder of fact can determine whether any particular debt instrument constitutes a "revenue bond" under this extremely broad definition.[3] However, I can and will opine that so long as only user fees — in this case, the DOC payments to the county — are pledged as payment, a lease-purchase agreement might qualify as a revenue bond under the expansive definition set forth at Ark. Const. amend. 65, § 3(a).
Question 5: If a county may enter into such a lease/purchase agreementwith a private contractor, what is the maximum term, including multiplerenewal terms, for which a county may enter into such a lease?
In my opinion, the twenty-year limitation set forth at A.C.A. §12-50-106(d) applies to limit the term of any otherwise permissible lease-purchase agreement. I further believe this limitation would preclude the county from committing to renew the lease upon the private contractor's demand at a point beyond this term.
Question 6: May the lease agreement require the Arkansas county topurchase the facility from the private contractor in the event theArkansas county fails to exercise one or more of its options to renew thelease?
I believe it would be inconsistent with the provisions of A.C.A. §12-50-106(d) to require any party to do anything beyond the twenty-year term authorized by statute. However, so long as the agreement did not constitute an impermissible conditional sales contract or obligate the parties for a term exceeding twenty years, I believe it could contain a conditional obligation to buy the facility for adequate consideration not including interest upon expiration of the lease.
Question 7: At the ends of the lease may the private contractor transfertitle to the facility to the county upon payment of a nominal amount ofmoney?
Your question raises the same constitutional concerns referenced in my response to question 4. As one of my predecessors noted in Ark. Op. Att'y Gen. No. 91-276:
 [M]any of these so-called "lease-purchase" agreements are in reality conditional sales contracts. Although title may not transfer to the lessee, other provisions of the "lease" may indicate that the lessee has the ownership interest in the property. See generally, (in the usury context), Hill v. Bentco Leasing, Inc., 288 Ark. 623, 708 S.W.2d 608 (1986), and Bell v. Itek Leasing Corp., 262 Ark. 22, 555 S.W.2d 1 (1977). The court in each case noted several factors which may indicate that a "lease" is actually a "sale," i.e.: 1) the payment over the lease term of an amount equal to or greater than the stated price of the goods, 2) all risk of loss of the property placed on the lessee, 3) remedies upon default are those ordinarily accorded to a conditional seller, (lessor could declare the entire amount due, repossess the equipment, sell it and hold the lessee liable for any deficiency), 4) any surplus on sale of the property would belong to the lessee, and 5) an option to buy the property for a nominal amount.
The court in Bell v. Itek Leasing, supra, noted that:
 It has been suggested that the "most fruitful single test" to distinguish a sale from a true lease is the absence of any appreciable residual in the lessor at the expiration of the lease. [Citations omitted.] This is the net effect of a purchase option for a nominal sum, since exercising that option is the only prudent course for the lessee. [Citations omitted.] Therefore, the lessor's only interest in the goods at the end of the lease is the nominal amount of the purchase option. There are other situations, however, where there is no provision for a purchase option by the lessee, and title never technically passes from the lessor to the lessee, but the lessor still has no expectation of a material interest in the property at the expiration of the lease term. The lessee in such cases is deemed to have become the owner of the property.
 Id. at 627.
As I remarked in response to question 4, a long-term conditional sale that involves the payment of interest would violate the provisions of Ark. Const. arts. 12, § 4 and 16, § 1, unless the contract qualified as a revenue bond under Ark. Const. amend. 65.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
Enclosures
[1] Supplementing this statute, A.C.A. § 12-27-114 directs county facilities holding inmates scheduled for transfer to prison to continue holding the inmates in the event of prison overcrowding at rates determined by the Board of Correction and Community Punishment.
[2] The procedural requirements for the issuance of such bonds are set forth at A.C.A. § 19-9-601 through -607.
[3] Although it would not appear to apply to the proposal set forth in your request, I will note that Ark. Const. amend. 78, § 2(a) authorizes the issuance without voter approval of short-term financing obligations maturing within a period of five years to finance the construction of capital improvements. Unless either Amendment 65 or Amendment 78 applies, the county is precluded from obligating funds in excess of current fiscal-year revenues without voter approval. Ark. Const. amend.62.