690 F.2d 809
 34 UCC Rep.Serv. 1357
 In re TULSA PORT WAREHOUSE COMPANY, INC.; Mid-America
Packing Specialists Division, a Division of the
Tulsa Port Warehouse Company, Inc., Bankrupt.
James ADELMAN, Trustee, Plaintiff-Appellee,
v.
GENERAL MOTORS ACCEPTANCE CORPORATION and Chuck Naiman Buick
Company, Defendants-Appellants.
 No. 80-1674.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 14, 1982.
 
 Craig Blackstock of Blackstock Joyce Pollard Blackstock & Montgomery, Tulsa, Okl., for defendants-appellants.
 Mickey D. Wilson, Tulsa, Okl., for plaintiff-appellee.
 Before McWILLIAMS, BREITENSTEIN and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 We are once again called upon to consider a question proven to be a prime source of litigation in the field of commercial law: when is a purported lease in fact a security agreement subject to the requirements of Article 9 of the Uniform Commercial Code (UCC)?
 
 
 2
 In this case, Tulsa Port Warehouse Company (bankrupt or lessee) entered into four automobile "Non-Maintenance Lease Agreements" with defendant Chuck Naiman Buick Company (lessor), which were subsequently assigned to defendant General Motors Acceptance Corporation (GMAC). Following the bankruptcy of the lessee, the trustee in bankruptcy and GMAC engaged in the classic battle to determine the priority of their interests in the vehicles. It is undisputed that GMAC did not comply with the requirements of Article 9 relating to the perfection of a security interest. If the leases are in fact security agreements, GMAC's interest in the automobiles is subordinate to that of the trustee under Oklahoma's version of the UCC, Okl.Stat. tit. 12A, § 9-301(1)(b), (3) (1981). The bankruptcy court resolved the issue in favor of the trustee, and the district court affirmed that decision.
 
 
 3
 Under the open-end leases[1] at issue, which are identical in all pertinent respects, the bankrupt leased the automobiles for commercial or business use for either a twenty-four or thirty-six month period. The monthly charge was determined as follows: first, the agreed depreciated value of the vehicle at the end of the lease term was deducted from the original value; second, to this remainder, designated "total amount of fixed monthly rentals for the lease term to be credited against original value," was added the item "total amount of fixed monthly rentals not to be credited against original value." Rec., vol. 1, at 45, Def.Ex. 1-4. The lease agreements did not further identify this latter amount or indicate how it was calculated.[2] Finally, the sum of these two items was divided by the number of months in the lease term to produce the amount due monthly.[3]
 
 
 4
 The open-end leases contain no option to purchase. Each lease includes termination and default provisions under which the lessee is obligated at termination to return the vehicle to the lessor. At that time, the lessor is required to dispose of the vehicle at wholesale in a commercially reasonable manner. If the amount realized at this sale exceeds the agreed depreciated value, the lessee receives the surplus. If the sale amount is less than the agreed depreciated value, the lessee is liable to the lessor for the deficit.
 
 
 5
 In Oklahoma, "(w)hether a lease is intended as security is to be determined by the facts of each case." Tit. 12A, § 1-201(37). This court has recently set out the analytical framework for determining whether an agreement is a true lease or a secured transaction. Steele v. Gebetsberger (In re Fashion Optical, Ltd.), 653 F.2d 1385, 1388-89 (10th Cir. 1981). We pointed out that when a lease does not contain a purchase option, the lease "will still be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot." Id. at 1389.
 
 
 6
 In considering the persistent lease versus secured transfer question, the courts have identified a number of significant factors tending to suggest that a sale has occurred: (1) whether the lease creates an equity in the lessee, American Standard Credit, Inc. v. National Cement Co., 643 F.2d 248, 262-63 (5th Cir. 1981); Rainier National Bank v. Inland Machinery Co., 29 Wash.App. 725, 729, 631 P.2d 389, 394-95 (1981); (2) whether the lessee is obligated to provide comprehensive insurance in favor of the lessor, Fashion Optical, 653 F.2d at 1389 n.3; Risk Equipment Co. v. Joe Necessary & Son, Inc. (In re Joe Necessary & Son, Inc.), 475 F.Supp. 610, 614 (W.D.Va.1979); (3) whether the lessee pays sales tax, American Standard Credit, 643 F.2d at 263 n.9; Joe Necessary & Son, 475 F.Supp. at 614; (4) whether the lessee pays all taxes, maintenance, and repairs, Fashion Optical, 653 F.2d at 1389 n.3; and (5) whether the lessee holds the lessor harmless, Rainier National Bank, 631 P.2d at 395, or assumes the risk of loss, Fashion Optical, 653 F.2d at 1389 n.3; American Standard Credit, 643 F.2d at 263 n.9; Rainier National Bank, 631 P.2d at 395.
 
 
 7
 With respect to the creation of an equity interest in the lessee in this case, the bankruptcy court and the district judge approved the discussion in Bill Swad Leasing Co. v. Stikes (In re Tillery), 571 F.2d 1361 (5th Cir. 1978). In Tillery, the court considered an open-end lease agreement substantially similar to the ones before us and concluded that "(t)he termination formula recognizes the equity of the 'Lessee,' in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition." Id. at 1365. Although defendants argue vigorously on appeal that Tillery was wrongly decided, we agree with its analysis on this issue.
 
 
 8
 Moreover, many of the other factors tending to indicate that a lease is in reality a secured transaction are present in this case. The lessee is required to obtain comprehensive insurance in favor of the lessor; pay sales tax and all other licenses, registration, and title fees; pay for all maintenance and repairs; and indemnify the lessor against all loss. As a practical matter, the lessee holds all the incidents of ownership except bare legal title.
 
 
 9
 Defendants conceded at oral argument that there is no economic difference to the lessor between the lease arrangement here and a secured transfer of property. Under the lease, the lessor is assured of receiving the entire original value of the vehicle plus an amount that realistically must be viewed as interest.[4] The fact that a portion of the original value may be paid by a third party wholesale purchaser after termination of the lease is of no economic significance to the lessor, particularly when the surplus or deficit from this sale is borne by the lessee. We agree with the trial judge's conclusion that "(t)he practical effect of this arrangement is the same as if lessee purchased the car, then sold it two or three years later and used the proceeds to pay off the note." Rec., vol. I, at 163-64.
 
 
 10
 In sum, we conclude that the agreements were transfers of property subject to a security interest. One purpose of Article 9 of the UCC is to provide notice of such prior interests to third parties dealing with personal property. To promote that end, buyer and seller should be prevented "from masquerading their secured installment sale as a 'lease,' thereby placing it beyond the reach of UCC provisions governing secured transactions." Fashion Optical, 653 F.2d at 1388.
 
 
 11
 Judgment affirmed.
 
 
 
 [1]
 The lessor uses closed-end and open-end leases. Under the closed-end leases, the lessee returns the vehicle to the lessor at the end of the lease term and the obligations of both come to an end. Under the open-end lease, however, the relationship between the lessor and lessee does not end. Rather, it involves the sale of the vehicle and an adjustment between the lessor and lessee based on the sales price, as more fully described hereinafter
 
 
 [2]
 The bankruptcy court held that this item "euphemistically describes ordinary interest without disclosure as to its rate." Rec., vol. I, at 28. The district court also found the amount to constitute interest
 
 
 [3]
 For example, under one of the 36 month leases for a Buick Regal, the monthly rental was computed as follows:
 
 
 [1]
 Original value of vehicle $7,798.00
2. Agreed deprediated value at end
 of lease term 3,450.00
 ---------
3. Total amount of fixed monthly
 rentals for the full base term to
 be credited against original value 4,348.00
4. Total amount of fixed monthly
 rentals not to be credited against
 original value 1,730.96
 ---------
5. Fixed monthly rental charges 6,078.96
6. Sales or use tax 243.00
 ---------
7. Total montly rental charge $6,321.96
8. Monthly rental payments $175.61
 
 
 [4]
 Our conclusion that the amount of fixed monthly rentals not to be credited against original value constitutes interest is supported by the lease provision that in the event of premature termination for any reason,a portion of this undefined item is to be earned by the lessor according to the "Rule of 78." Rec., vol. I, at 45, Def.Ex. 1-4. The Rule of 78's is a typical method used in financing transactions to compute the financing charges earned by the lender or to be rebated to the borrower if the loan is prematurely terminated. See Bone v. Hibernia Bank, 493 F.2d 135, 136-37 (9th Cir. 1974)