JOHN CARLSON[1] vs. LOUIS F. GIACCHETTI.[2]

No. 92-P-80.

Plymouth. April 13, 1993. - July 29, 1993.

Present: SMITH, GILLERMAN, & IRELAND, JJ.

*Uniform Commercial Code*, Security interest. *Contract*, Equipment
lease.

Discussion of G. L. c. 106, §§ 9-102 and 1-201 (37), with respect to the
   factors relevant to a determination whether an equipment lease was in-
   tended by the parties to be treated under the Uniform Commercial
   Code as a true lease or as a security agreement. [60-65]
An equipment lease was to be treated under the Uniform Commercial
   Code as a true lease, rather than a security agreement, where a judge
   was warranted in finding that the lessor had reserved an economically
   significant reversionary interest in the leased goods; consequently, as
   the lessee had no power to transfer title to the equipment, a purchaser
   from the lessee without notice of the lessor's interest was subject to
   liability for conversion. [64-65]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 18, 1989.

The case was heard by *Suzanne V. DelVecchio*, J.

*Jay M. Lipis* for the plaintiff.

*John W. Lincoln* for the defendant.

GILLERMAN, J. Whether, under the Uniform Commercial
Code (Code), an equipment lease is to be treated as a "true
lease" or as a security agreement is an issue that has been
litigated extensively for more than two decades, but has yet
to be discussed in any detail by a Massachusetts appellate
court.[3] We must do so now, with the benefit of the findings of

---

[1]Doing business as Chassis Liner.

[2]Also known as Lou Giacchetti, doing business as Lou's Auto Body.

[3]Many of the cases are collected in Annot., Equipment Leases as Secur-
ity Interest Within Uniform Commercial Code § 1-201(37), 76 A.L.R.3d
11 (1977 & Supp. 1992). For Massachusetts decisions, see, e.g.,

fact made by a judge of the Superior Court after a bench trial.

The material facts found by the judge are these. John Carlson manufactures, sells and leases machinery used in the repair of damaged automobile bodies. In April of 1988 Carlson leased a six-tower chassis liner, a machine used in auto body shops to remove dents from damaged cars, together with a complete accessory package, to one Richard A. King, the owner of an auto body repair shop in Quincy. The lease called for a monthly payment of $572.40 for each of sixty months, with two such payments to be made in advance of delivery. The sixty payments came to a total of $34,344. King made the required advance payment for two months, and then defaulted.

In October of 1988, King went out of business and sold the chassis liner to the defendant Louis Giacchetti for $8,600. Giacchetti had no notice of Carlson's interest in the machinery, for it was not until late in December that Carlson filed financing statements in the appropriate public offices. In April, 1989, Carlson brought this action against Giacchetti, who refused to return the chassis liner to Carlson, for conversion and violation of G. L. c. 93A.[4] If the court found the document was a "true lease" and not a security agreement subject to the provisions of art. 9 of the Uniform Commercial Code, then King had no power to transfer title to the equipment, and Giacchetti may be liable for conversion. See Restatement (Second) of Torts § 229 (1965).

The judge, however, resolved the issue of ownership in favor of Giacchetti by ruling that the lease agreement between the original parties was not a "true lease," but rather,

---

*Equalease Corp.* v. *D'Annolfo,* 6 Mass. App. Ct. 919 (1978); *Patriot Gen. Life Ins. Co.* v. *CFC Inv. Co.,* 11 Mass. App. Ct. 857, 862 n.6 (1981). There are several cases in the United States Bankruptcy Court for the District of Massachusetts, see, e.g., *In re Keydata Corp.,* 18 B.R. 907 (Bankr. D. Mass. 1982); *In re Access Equip., Inc.,* 62 B.R. 642 (Bankr. D. Mass. 1986); *In re Mariner Communications, Inc.,* 76 B.R. 242 (Bankr. D. Mass. 1987).

[4]Carlson's brief makes no mention of the G. L. c. 93A claim, and therefore we do not consider the point. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

a security agreement, and that Carlson's failure to perfect his security interest until December was fatal. See G. L. c. 106, § 9-301(1)*(c)*. We disagree with the trial judge and, for the reasons discussed below, we conclude that the lease was not intended as a security agreement.

We look to G. L. c. 106, §§ 9-102 and 1-201(37), to determine whether a contract, characterized by the parties as a lease, is a "true lease" or a security agreement. Article 9 (G. L. c. 106, §§ 9-101 et seq.) applies, except as otherwise provided, to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures . . . ." G. L. c. 106, § 9-102(1)*(a)*, inserted by St. 1957, c. 765, § 1. Section 9-102(2) provides that art. 9 applies to "security interests created by contract including . . . [a] lease . . . intended as security." General Laws c. 106, § 9-102(2), inserted by St. 1957, c. 765, § 1.

The definition of a security agreement is contained in G. L. c. 106, § 1-201(37), inserted by St. 1957, c. 765, § 1, which provides in relevant part: "Whether a lease is intended as security is to be determined by the facts of each case; however, *(a)* the inclusion of an option to purchase does not of itself make the lease one intended for security, and *(b)* an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The lease in the case before us, the principal provisions of which we summarize in the margin,[5] does not include an op-

---

[5]The lease provides that:

(a) The lease is noncancellable for the full term;

(b) Title remains with lessor at all times, shall under no circumstances pass to the lessee, and upon termination lessee must at his own expense deliver the equipment to lessor;

(c) Lessor disclaims all warranties (the manufacturer was deemed solely responsible for warranties);

(d) Lessee is responsible for keeping the chassis liner insured against loss by fire, and all other hazards, as well as maintaining insurance to cover the lessor with respect to liability for personal

tion in the lessee to purchase the equipment for no, or nominal, consideration, and thus the instrument does not fall within subparagraph (b) of § 1-201(37). On that basis, the issue which arises under both sections of the Code is whether, on all the facts, the parties *intended* to create a security interest. See 3 U.L.A., U.C.C., Comment 1 to § 9-102 (Master ed. 1992) ("Except for sales of accounts and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? . . . Transactions in the form of . . . leases are subject to this Article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended").

While the Code directs the analysis to what was intended by the parties, it offers no guidelines for deciding the question (other than the rule of law, not applicable to this case, expressed in G. L. c. 106, § 1-201[37][b]). Obviously, the declared intention of the parties, standing alone, cannot be decisive. "No one would contend that third parties were bound by the clear intention of the contracting parties to use a device they call a lease if the effect created by the transaction is that of a sale. The test certainly must be applied in accordance with the outward appearance of the facts rather

---

injuries, death, and damage to or loss of use of property resulting from the ownership, use and operation of the equipment;

(e) The loss, destruction, theft of, or damage to the leased equipment does not absolve lessee of his responsibility to pay the full rental payments;

(f) Lessee must pay all fees, taxes, charges, liens, or assessments incident to ownership, use, operation and leasing of the chassis liner, exclusive of taxes based upon income or gross receipts of lessor;

(g) Lessee must provide and pay for all maintenance on the chassis liner;

(h) Any failure of lessee to pay any of the installments of rent, or to perform any of the conditions of the lease, grants the lessor the right to declare the remaining unpaid installments of rent immediately due and payable and to terminate the lessee's right to continue in possession of the chassis liner, all without notice or demand.

In addition, the lease provides that the lessor was authorized to file a financing statement, the parties intended that this be a true lease, and the lease constitutes the entire agreement of the parties.

than in accordance with the intent held by one or both of the parties while creating effects contrary to those normally produced by the kind of instrument purportedly employed by the parties." Coogan, Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1-201(37) and Article 9, 1973 Duke L.J. 909, 916 n.12 (1973). Professor Gilmore, in his treatise on security interests, has also written that the word "intended" in § 1-201(37) "has nothing to do with the subjective intention of the parties, or either of them." Gilmore, Security Interests in Personal Property § 11.2, at 338 (1965).

The vagaries inherent in § 1-201(37) have obliged the courts to resort to the "facts of each case," as directed by the terms of § 1-201(37), with the effect of producing complex guidelines for adjudication which have left judicial decisions entirely unpredictable. The high water mark was reached in the decision of the Bankruptcy Court in *In re Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr. D. Conn. 1980), where the court, in order to determine the intent of the parties, identified no fewer than sixteen separate factors, having to do with the content of the document and the factual setting of the transaction, as relevant to the ultimate determination. See also Annot., Equipment Leases as Security Interest within Uniform Commercial Code § 1-201(37), 76 A.L.R.3d 11, 54-66 (1977), where additional cases are collected. The factors recited by the Bankruptcy Court in *Brookside* include those that focus on whether the lease is a "net lease" (i.e., where the lessee assumes all risk of loss and pays all taxes, insurance, maintenance, and the like), whether the lease is a "full payout lease" (i.e., where the lessee pays an amount equal to or greater than the lessor's cost of the goods or their fair market value), whether the lessor is a financing agency, whether there is an acceleration clause in the lease, whether the lessor has permission to file a financing statement, and whether the lessee has an option to purchase the goods for a nominal consideration. The *Brookside* approach to the problem was adopted by the Bankruptcy Court in *In re Mariner Communications, Inc.*, 76 B.R. 242 (Bankr.

D. Mass. 1987), the decision relied upon by Giacchetti and by the trial judge in this case. We believe that a preferable approach to the problem is that proposed by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, the original sponsors of the Uniform Commercial Code. The sponsors approved a revised § 1-201(37) in 1987,[6] as well as a definition, for the first time, of "lease" in a new art. 2A.

---

[6]The revised § 1-201(37) reads, in relevant part, as follows:

"Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

"(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

"(b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

"(c) the lessee has the option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement; or

"(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal consideration upon compliance with the lease agreement.

"A transaction does not create a security interest merely because it provides that:

"(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

"(b) the lessee assumes risk of loss of goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

"(c) the lessee has an option to renew the lease or to become the owner of the goods;

"(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

"(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed."

Carlson v. Giacchetti.

The revised version of § 1-201(37) (hereinafter "revised § 1-201[37]") deletes all reference to the intent of the parties. It offers, instead, a straightforward economic analysis as the focal point of inquiry: if the obligations of the lessee under the lease are not subject to termination by the lessee, and if the lease is for the full economic life of the goods (or if the lessee may, without further consideration, acquire all rights in the goods for the full economic life of the goods) then a security interest is created. But if the lessor retains the reversionary interest in the goods, then the transaction is a true lease. Revised § 1-201(37) also identifies four factors any of which, if included in the lease, do not create a security interest. Two of these factors bear on the facts of this case: the "full payout lease," and the "net lease."

The Legislature has not adopted revised § 1-201(37),[7] but that does not preclude this court from looking to the revised section for guidance.[8] We see nothing in the proposed revision which is inconsistent with the existing statutory provision. Construing the phrase "intended as security" to refer principally to the distribution of rights in respect of the economic life of the leased equipment will most likely reveal what was "intended" by the parties. Where, for example, the economic life of the leased equipment plainly will not have been exhausted at the end of the term of the lease, there will be little, if any, justification for the conclusion that the parties intended a security interest incident to a sale, rather than a lease. In our view, the provisions of revised § 1-201(37) illuminate, but do not alter, the meaning of the existing provisions of § 1-201(37). See *In re Aspen Impressions, Inc.*, 94 B.R. 861, 866 (Bankr. E.D. Pa. 1989) ("The question at bot-

[7]A revised version of art. 2A was introduced in the Massachusetts Legislature in 1989 as House No. 3341, but did not pass. Haydock, UCC Article 2A, The History of the Article, in UCC Article 2A: Mastering The New Law of Personal Property Leasing 2 (copy of House No. 3341 reproduced at 75) (Mass. Continuing Legal Educ., 1989).

[8]As of December 1992, thirty-one States have enacted art. 2A and the conforming amendments to arts. 1 and 9; two States have enacted only the amendments to § 1-201(37). See State UCC Variations, U.C.C. Rep. Serv. (Callaghan), Table of State Enactments of 1987 Amendments (art. 2A).

tom becomes whether the lessor has, in effect, at the end of the instrument's term, surrendered any claim to the residual value of the leased goods"); *In re Cole*, 114 B.R. 278, 281 (Bankr. N.D. Okla. 1990) ("It appears to the Court that the 1988 [*sic*] amendment merely revised § 1-201(37) to further aid courts in drawing lines between leases and agreements creating security interests. The amendment did not change the substantive law"); *In re Zerkle Trucking Co.*, 132 B.R. 316, 320-321 (Bankr. S.D. W.Va. 1991) ("the 1987 amendments to the Uniform Commercial Code . . . gave additional guidance . . . on what constitutes a security agreement and eliminated several factors as being determinative. The provisions are not binding on this Court, but are instructive"). Further, it facilitates an uncomplicated analysis of the lease in dispute, and thereby enhances for practitioners the predictability of the judicial outcome.

In the document before us the lessee's obligations were noncancellable by the lessee, and the lease contained no option to purchase by the lessee. Further, the lessee was obligated to keep the leased equipment in good repair and condition and, at the end of the term of the lease, to assemble and deliver the equipment to the lessor. Consistent with these covenants of the lessee was the judge's finding that upon the termination of the lease Carlson "would . . . be entitled to a return of the equipment which still had a significant resale value." This last finding by the judge establishes that Carlson had reserved an economically significant reversionary interest in the lease goods. That finding, in the context of the lease provisions we have just described, requires the conclusion that the lease before us is a true lease and was not intended as a security agreement. See *Rushton* v. *Shea*, 419 F. Supp. 1349, 1365-1366 (D. Del. 1976); *In re Aspen Impressions, Inc.*, 94 B.R. at 865-866; *In re Loop Hosp. Partnership*, 35 B.R. 929, 937 (Bankr. N.D. Ill. 1983). See also *Hervey* v. *Rhode Island Locomotive Works*, 93 U.S. 664, 672 (1876) ("In determining the real character of a contract, courts will always look to its purpose, rather than the name given to it by the parties").

The judge made numerous findings with regard to the terms of the lease, the cumulative effect of which was that the arrangement was found to be both a net lease and a full payout lease to Carlson's substantial benefit. But these provisions, either alone or in combination, do not call for a different result in this case. The contractual arrangements which are so distinctly in favor of Carlson do not uncommonly reflect the relative bargaining positions of the parties, the value of the credit provided by a lease, and the uniqueness of the equipment; consequently, they are as likely to appear in a "true lease" as they are in a secured transaction.[9]

The judgment is vacated and the case remanded to the Superior Court for a trial on the issue of conversion, and, if appropriate, the assessment of the plaintiff's damages, if any. See Nolan & Sartorio, Tort Law §§ 55(5) & 60 (2d. ed. 1989).

*So ordered.*

---

[9]The judge concluded that the transaction, if treated as a lease, would be "unreasonable." Giacchetti's brief does not discuss the point, and we conclude that this ruling by the judge is not adequately supported by the subsidiary findings of fact.