**In re Lisa Fay ALLEN, Debtor.**

**Bankruptcy No. 394-32103-hlh13.**

United States Bankruptcy Court,
D. Oregon.

Oct. 26, 1994.

Darquise Cloutier, Greenen & Greenen, Vancouver, WA, for Affordable Rent–To–Own.

Magar E. Magar, Portland, OR, for debtor.

## MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

On March 31, 1994 the debtor, Lisa F. Allen, entered into an agreement to lease a Hot Point washer and dryer from Affordable Rent–to–Own, dba Rentown USA (Rentown). On April 7, 1994, about one week after leas-ing the washer and dryer, the debtor filed a voluntary petition under Chapter 13. Rentown moves for a relief from stay to repos-sess the washer and dryer. Before deter-mining whether Rentown's interest in the washer and dryer is adequately protected, I must determine whether the transaction cre-ated a lease or sale with a security interest. In response to Rentown's motion, the debtor also argues that the agreement is unconscio-nable. The debtor has proposed in her plan to purchase the washer and dryer by paying the fair market value which is less than the amount owed under the agreement.

## FACTS

The debtor tired of her twice weekly trips to the laundromat and decided to try to obtain credit to finance the purchase of a washer and dryer. She applied for credit at Smith's Home Furnishings and Montgomery Ward, but both stores denied her application. She also tried to rent a washer and dryer from another rent-to-own store, but could not because of her credit history.

The debtor learned of Rentown from tele-vision commercials and customers of Ren-town. After seeing one commercial, she called Rentown and submitted an application over the phone. Rentown approved her ap-plication. Two Rentown employees delivered the washer and dryer. The employees went over the agreement with the debtor. She signed the agreement without going to the store. The debtor made one payment.

Although the debtor reads English, she admits that she did not read the agreement carefully. The agreement called for a mini-mum three months or 13 weeks lease and for subsequent monthly or weekly renewals ter-minable at any time by the debtor. Rentown agreed to cover the costs of any repairs "due to defects in workmanship or parts." (Debt-or's Ex. 5, at 2.) Under the agreement, the debtor could purchase the washer and dryer for the cash price of $779.48 or by renting the washer and dryer for 24 months or 104 weeks. The agreement disclosed that by renting the washer and dryer on a weekly basis, the debtor would pay $1,558.96. Ren-

town purchased the washer for $300 and the dryer for $223. (Debtor's Ex. 6, at 1.)

In the past, the debtor had leased a couch and love seat from a local competitor of Rentown. After a couple of months, she decided that she could not afford the payment and asked the merchant to pick up the couch and love seat.

## DISCUSSION

**1. Did the rent-to-own transaction create a lease or a sale with a security interest?**

■ State law determines whether an agreement constitutes a true lease or a security agreement. *Grassmueck v. Harvey,* CV–92–6358–HO, 1993 WL 762888, slip op. at 3 (D.Or.1993); *In re Colin,* 136 B.R. 856, 857 (Bankr.D.Or.1991). The Oregon Legislature has amended ORS 71.2010(37) and promulgated ORS 72A.1030(1)(j) to provide a test that draws a brighter line between a lease and security interest. U.C.C. § 2A–103, comment (j) (1990). The test no longer relies on the intent of the parties. U.C.C. § 1–201, comment (1987 Amendment); *In re Lerch,* 147 B.R. 455, 460 (Bankr.C.D.Ill.1992); *Carlson v. Giacchetti,* 35 Mass.App.Ct. 57, 63, 616 N.E.2d 810, 813 (1993); and 1A James J. White & Robert R. Summers, *Uniform Commercial Code Article 2A Leases of Goods* 8 (1991) (hereinafter White & Summers). Instead it relies on the economics of the transactions to determine whether the transaction created a lease or security interest. *Carlson,* 35 Mass.App.Ct. at 63, 616 N.E.2d at 813.

■ Under the new test, the touchstone for making the determination is whether the lessor retained an economically significant reversionary interest. *Id.;* 1A White & Summers, *supra,* at 9–10. As White & Summers explained:

[O]ne characteristic of a lease is that the 'title holder' retains a reversionary interest. In effect, the new section 1–207(37) sends the lawyer on a search for the interest. If it can be found, the transaction is a

lease; if none can be found, the transaction is a sale with a security interest.

*Id.*

ORS 71.2010(37) describes a three-part test to guide the search for the reversionary interest and to determine whether a transaction created a lease or security interest. A transaction creates a security interest if: (1) the lessee has an obligation to continue paying consideration for the term of the lease; (2) the lessee cannot terminate the obligation; and (3) one of the four conditions described by ORS 71.2010(37)(a)(A)–(D) is met. U.C.C., § 1–201, comment (1987 Amendment); *see also,* 1A White & Summers, *supra,* at 11–12.

■ In this case, the first two parts of the test are met. The debtor entered into an agreement that obligated her to rent the washer and dryer for the first three months or 13 weeks of the lease and that did not allow her to terminate this commitment during the initial time period. (Debtor's Ex. 5, at 1–2.) The issue is whether one of the four conditions is met.

The debtor only contends that subparagraphs (B) and (D) are met. Those provisions provide:

(B) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods; ...

(D) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Subparagraph (B) is not met. Under subparagraph (B) if the debtor is bound to renew the lease for the remaining economic life of the washer and dryer or bound to become the owner, then the transaction creates a security interest. However, the debtor is not bound to renew the lease or become owner of the washer and dryer after the initial time period. According to the agreement, she is "not obligated in any way" to renew the lease or to buy the washer or dryer. (Debtor's Ex. 5, at 2.)

Debtor argues that she is bound to renew the contract, because of economic duress or coercion (i.e., she could only go to Rentown to obtain the washer and dryer). Under some circumstances, economic duress or coercion, in effect, may bind the lessee. *See* U.C.C. § 2A–103, comment (j) (1990). Here, however, the debtor entered into an agreement about a week before filing for bankruptcy that obligates her to pay 25% of the cash price for the first three months or 13 weeks, but does not obligate her to renew the lease or purchase the washer and dryer after that time. Given these facts, especially the early point in the transaction, there is not sufficient economic duress or coercion to bind the debtor.

Subparagraph (D) also is not met. Under subparagraph (D), if the debtor has an option to become the owner of the washer and dryer for no additional consideration or nominal consideration after compliance with the agreement, the transaction creates a security interest. Although the debtor had an option to buy the washer and dryer, she had to either pay the cash price or renew the lease over 90 weeks or over 21 months by paying the required amount. Such consideration represents the fair market value of the washer and dryer, or more than the fair market value, and, thus, is not nominal. *See* ORS 71.2010(37)(b)(E) and (c)(A).

The debtor argues that the lease agreement "is not limited to the initial term but contemplates the **entire agreement**" and, because the debtor does not have to pay any consideration after complying with the entire agreement, subparagraph (D) is satisfied. (Debtor's emphasis and underlining.) The debtor has misinterpreted the application of the test.[1] Whether the debtor has the option to purchase the washer and dryer for no consideration or nominal consideration depends on the facts and circumstances of the case. ORS 71.2010(37)(a). Comment (j) for

§ 2A–103 describes the application of the test and specifically states that a court should examine the "facts and circumstances at the time of each renewal" and "that a transaction that first creates a lease" may later create a security interest. Given that the debtor entered into the agreement with Rentown about one week before filing, the debtor's obligation to continue renting expired 13 weeks after the parties executed the lease and the option to purchase arises after 90 weeks or 21 months, subparagraph (D) is not met.

Finally, with regard to earlier precedent, the amendments to ORS 71.2010(37) reject the narrow reading of the old version made by the Ninth Circuit Court of Appeals in *In re J.A. Thompson & Son, Inc.*, 665 F.2d 941 (9th Cir.1982) and similar readings by the Oregon Supreme Court in *Peco, Inc. v. Hartbauer Tool & Die Co.*, 262 Or. 573, 500 P.2d 708 (1972) and the Federal District Court in *Grassmueck.* *See* 1A White & Summers, *supra*, at 12 n. 18, 15. These cases stated that an agreement that contains an option to purchase for no additional consideration or nominal consideration is conclusively presumed to be a security interest or is a security interest as a matter of law.[2]

Amendments to ORS 71.2010(37)(b) responded to this position. ORS 71.2010(37)(b) now states that a transaction does not create a security interest merely because it provides that:

(C) The lessee has an option to renew the lease or to become the owner of the goods; ... or

(E) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

---

1. The debtor relied on comment (k) for § 2A–103, but should have relied on comment (j) for § 2A–103. Comment (k) explains what constitutes the contents of a lease agreement, not the application of the test to determine whether a transaction creates a lease or security interest. Comment (j) explains the definition of a lease and whether a transaction creates a lease or security interest.

2. Under the old version of 1–201(37), a Connecticut court followed this approach when it presumptively concluded that a rent-to-own agreement created a security interest. *Murphy v. McNamara*, 36 Conn.Supp. 183, 186–87, 416 A.2d 170, 174 (1979).

The comment for § 1–201 (1987 Amendment) specifically cites as a better approach *Arnold Mach. Co. v. Balls*, 624 P.2d 678 (Utah 1981), which held that a transaction created a lease when the lessee could terminate the lease after an initial six-month period and had the option to purchase. *See also* 1A White & Summers, *supra* at 12 n. 18, 15.

The transaction between the debtor and Rentown created a lease, not a sale with a security interest. At this initial stage in the transaction, Rentown retains a substantial reversionary interest. The test described by ORS 71.2010(37)(a) is not met.

### 2. Is the lease unconscionable?

■ No Oregon court has interpreted unconscionability under ORS 72A.1080. Judge Hess in *In re Colin* examined whether a rent-to-own agreement was unconscionable, but ORS 72A.1080 was not effective at the time the debtor in *Colin* entered into the agreement.[3] As a result, Judge Hess did not discuss ORS 72A.1080. Because ORS 72A.1080 amounts to little more than reiteration of ORS 72.3020, I rely on the case law discussing ORS 72.3020.

Although ORS 72.3020 does not define unconscionability, Oregon has adopted the standard described in the comment for U.C.C. § 2–302. *W.L. May Co. v. Philco–Ford Corp.*, 273 Or. 701, 707–08, 543 P.2d 283, 286 (1975); *Oregon Bank v. Nautilus Crane & Equipment Corp.*, 68 Or.App. 131, 144, 683 P.2d 95, 104 (1984). According to the comment:

> The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention and unfair surprise ... and not disturbance of allocation of

risks because of superior bargaining power.

(citations omitted.) In applying this test, I examine the circumstances existing at the time of the execution of the lease. *W.L. May*, 273 Or. at 707–08, 543 P.2d at 287; *see Zemp v. Rowland* 31 Or.App. 1105, 1109–10, 572 P.2d 637, 639 (1977).

In practice, Oregon courts frequently cite to the comment, but then follow a balancing approach by determining whether there is certain amount of procedural (bargaining naughtiness) and substantive (overly harsh terms) unconscionability.[4] For example, *W.L. May* did not find a repurchase provision to be unconscionable, because both parties were sophisticated business people and the repurchase provision was "not unduly one-sided." 273 Or. at 708–09, 543 P.2d at 287. Although the Oregon Supreme Court in *Best v. United States Nat'l Bank* held that unconscionability did not apply to the service charge for processing a nonsufficient-fund check, it explained that even if unconscionability applied, the increase in processing fees was not unconscionable, because there was little "indicia of one sided bargaining" and the fee increase was relatively small and similar to what other banks charged. 303 Or. 557, 560–61, 739 P.2d 554, 556 (1987). Finally, *Colin* refused to consider whether a rent-to-own agreement was unconscionable when the debtor did not allege facts indicating overreaching or inequitable conduct and the debtor relied solely on the price of the rent charged. 136 B.R. at 858–59.

Under either the comment test or the balancing approach, the debtor has not shown that the agreement is unconscionable. When read as a whole and considering the surrounding circumstances, including the debtor's credit difficulties, the terms do not unreasonably favor Rentown. Rentown agreed to provide a new Hot Point washer and dryer, promised to repair the washer and dryer and guaranteed a working washer and dryer for the term of the lease. The debtor

---

3. ORS 72A.1080 became effective 91 days after July 4, 1989, the end of the 1989 legislative session, or October 3, 1989. Or. Const. art. IV, § 28. The debtor entered into the rent-to-own agreement on August 1, 1989. *Colin*, 136 B.R. at 857.

4. *See generally* Arthur A. Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U.Pa.L.Rev. 485, 487 (1967) (referring to "bargaining naughtiness" as procedural unconscionability and to "evils in the resulting contract" as substantive unconscionability).

agreed to lease the washer and dryer for at least three months or 13 weeks for $59.95 a month or $14.99 a week. After the initial time period, the debtor had the right to terminate the lease without any further obligation. The debtor understands this right. In fact, when she previously leased a couch and love seat, she decided she could not afford the payments and terminated the lease after a few months.

The debtor argues that Rentown agreed to sell the washer and dryer for an excessive price or charged an excessive interest rate. However as explained previously, the debtor entered into a lease agreement with an option to buy, not a sales agreement. As a result, I focus on the terms of the lease agreement, not the sale price or interest charged for a sale. *See* ORS 72A.1080(1). Even if the sale price is relevant, the debtor could have purchased the washer and dryer for half the rental payments, or $779.48. Given that Rentown purchased the washer and dryer for $523, $779.48 is not a shocking price.

The circumstances surrounding the execution of the agreement do not indicate oppressive bargaining practices by Rentown or a material element of unfair surprise. After seeing a Rentown television advertisement, the debtor called Rentown about obtaining a washer and dryer. Rentown approved her application over the telephone. The debtor does not contend that Rentown pressured her to apply. Two men then came to her home, explained the procedures and gave her the agreement to sign.[5] The lease was written in understandable terms and disclosed the terms required under Oregon law. *See* ORS 646.251. Specifically, it disclosed the total weekly payments, the debtor's option to purchase the washer and dryer for half the total weekly payments, and the debtor's right

to terminate the agreement. The debtor had the opportunity to read the lease before signing it. There is no evidence that the debtor had difficulty in understanding the agreement or that the employees pressured the debtor. After the debtor signed the agreement, the two men delivered the washer and dryer.

The debtor argues that certain television advertisements and a brochure created unfair expectations. The debtor explains that the advertisements and brochure misled her by claiming that all rent applies to ownership. Given that the agreement explained this claim and other pertinent advertisement claims in understandable terms and that the evidence indicates that the debtor was able to protect herself, the advertisements and brochure did not create unfair surprise.

The debtor specifically cites *Murphy,* 36 Conn.Supp. at 184, 416 A.2d at 173, in support of her position. On the surface *Murphy* appears factually similar to this case. In *Murphy,* a television advertisement, stating that a consumer could obtain ownership without credit, persuaded a buyer to enter into a rent-to-own agreement. The Connecticut court concluded that a rent-to-own merchant's conduct constituted unfair trade practice under state law, because the rent-to-own agreement required the buyer to pay two and half times the retail price, the agreement did not state the total purchase price and the rent-to-own merchant used unscrupulous collection practices. In reaching this conclusion, the court stated that excessive price can make an agreement unconscionable.

*Murphy* is distinguishable from this case. *Murphy* focused on the sale price, because it concluded, based on the old version of U.C.C. § 1–207(37)[6] and with materially different facts,[7] that the rent-to-own transaction con-

---

5. According to one court, the fact that a door-to-door salesman completed the sale favored a finding of unconscionability. *Toker v. Westerman,* 113 N.J.Super. 452, 454, 274 A.2d 78, 80 (1970). The court found a price of two and half times a reasonable retail value particularly shocking where a dealer had less overhead because the dealer did not maintain a store. *Id.* Although the debtor did not visit Rentown's store to purchase the washer and dryer, the *Toker* case is factually distinguishable. The evidence indicates

that Rentown had a higher overhead than most retail stores, because it provided a higher level of service than most stores that strictly sell merchandise and had a higher default rate on its agreements.

6. *See supra* note 2 and accompanying text.

7. For example, the consumer had made payments totaling $436 on a television with a retail price of $499. Here, the debtor has paid $69.95

stituted a sale, not a lease. *Murphy*, 36 Conn.Supp. at 186–87, 416 A.2d at 174. Here, because the transaction created a lease, I must focus on the terms of the lease. *See* ORS 72A.1080(1). Moreover, *Murphy* relied on other facts that indicated overreaching and inequitable conduct to make a determination not only about the unfair trade practice, but also about unconscionability. 36 Conn.Supp. at 189–92, 416 A.2d at 175–77. Specifically, the rent-to-own merchant did not provide the total purchase price to the consumer and engaged in unscrupulous collection practices.[8] The evidence does not indicate such overreaching or inequitable conduct by Rentown.

In light of the circumstances existing at the time of the execution of the lease, the lease is not unconscionable.

## CONCLUSION

The rent-to-own transaction between the debtor and Rentown created a lease, not a sale with a security interest. Given the surrounding circumstances, the agreement is not unconscionable. Rentown's motion for relief from stay is denied. Debtor shall continue to make the lease payments as adequate protection.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Fed.R.Bankr.P. 7052 and they shall not be separately stated.

on a washer and dryer with a retail price ranging between $550 (at one retail store) and $779 (at Rentown).

8. The relevance of conduct after the execution of the contract to unconscionability is questionable because unconscionability is determined based on circumstances existing at the time of the execution of the contract.