[Nos. H012690, H013115. Sixth Dist. Jan. 18, 1996.]

ARNOLD ADDISON, Plaintiff and Respondent, v.
BRIAN BURNETT, Defendant and Appellant.

**COUNSEL**

Michael T. Morrissey for Defendant and Appellant.

M. Jean Starcevich for Plaintiff and Respondent.

**OPINION**

**ELIA, J.**—In this action for breach of an automobile lease and related causes of action, defendant Brian Burnett moved for nonsuit, claiming the lease was actually a security agreement as a matter of law. The trial court denied the motion, and at the conclusion of a jury trial, Burnett was found liable under the lease.

Burnett appeals, contending the court erred in ruling that the disputed document was a true lease rather than a disguised security agreement. He also appeals, without argument, from the postjudgment order awarding attorney fees, solely to preserve his challenge in the event that the underlying judgment is reversed. We find no basis for reversal, however, and accordingly affirm both the judgment and the attorney fee order.

*Background*

Burnett is an automobile dealer, co-owner (with his wife) of RBB, Inc., doing business as Ferrari of Los Gatos. Addison, the owner of an automobile leasing company, regularly did business with Burnett personally as well as with Ferrari of Los Gatos. He would purchase a vehicle from the dealership for Burnett or for Burnett's customer and then lease it back to that person.

In May of 1989 Burnett asked Addison to purchase a 1967 Ferrari 330 GTC Roadster and lease it back to him. The car was worth $240,000, and Addison did not have sufficient resources to make this purchase. Addison contacted Executive Car Leasing Company (Executive) on Burnett's behalf. Executive consented to the transaction on the condition that Addison guarantee Burnett's obligation under the lease. As an accommodation to Burnett, Addison agreed to sign a separate guaranty. On July 17, 1989, Burnett signed a lease agreement with Executive for the car.

The lease provided that the "original value" of the Ferrari 330 GTC Roadster was $244,800. Burnett was to pay a total of $4,213.23 per month for 36 months. At the expiration of the term or surrender upon Burnett's default, Executive had the option of selling the vehicle or having it appraised at its wholesale value. In either case, Executive was obligated to credit Burnett with the excess of the sale proceeds or "appraised value" over its depreciated value. If instead the depreciated value exceeded its appraised value or the sale proceeds, Burnett would owe the difference to Executive "as additional rental."[1] The lease further provided that the vehicle was "the sole property of Lessor, and Lessee shall have no right, title or interest

---

[1]The termination provision, paragraph 4b, stated in full: "When Lessee surrenders said vehicle to Lessor at the expiration or termination of this Lease, or otherwise, or upon Lessor's obtaining possession of said vehicle after Lessee's default, Lessee acknowledges and agrees that Lessor may itself, in its sole discretion, appraise and evaluate said vehicle (as described in Paragraph 4, Section d), at its then wholesale value, or, at Lessor's option, Lessee acknowledges and agrees that Lessor may, alternatively, sell said vehicle. Lessee does hereby agree that when Lessee surrenders said vehicle to Lessor at the expiration or termination of this Lease, or otherwise, or upon Lessor's obtaining possession of said vehicle after Lessee's default, then Lessor shall, and does hereby, have the right to proceed by appraisal (as described in Paragraph 4, Section d), or by sale, at Lessor's sole and exclusive option. If Lessor proceeds by sale, Lessee acknowledges and agrees that Lessor has no facilities to sell its motor vehicles at retail and is under no duty to do so with regard to the vehicle leased hereunder, and Lessor makes no representation or warranty as to the amount of proceeds of such sale. If the appraised value or net sale proceeds realized by Lessor, exceed the depreciated value of said vehicle computed in accordance with subparagraph a of Paragraph 4 hereof, Lessor shall credit the said excess to Lessee as a refund of a portion of the fixed rentals theretofore paid by Lessee, either as a reduction of the original value of the subsequent vehicle leased, or by cash payment to the Lessee, at the sole option of the Lessor; however,

therein as to the ownership thereof and shall have no right or option whatsoever to purchase said vehicle at any time, and this instrument is a lease and not a contract of sale." Just above his signature, Burnett acknowledged that he understood that he would not be treated as the owner of the vehicle for federal income tax purposes. He further acknowledged that he had read and fully understood all of the provisions of the lease.

On December 1, 1990, Burnett breached the lease by failing to make the monthly payment due. Addison attempted to help bring the payments current by making a series of payments totaling $16,852.95. On January 10, 1991, Executive notified Burnett of his default and advised him of the alternatives available under the lease. He could pay the final balance of $113,921.72, thereby completing his lease obligation; he could pay the past due amount of $13,347.30 and continue the lease; or he could purchase the vehicle for $255,809.78.

On March 15, 1991, the Ferrari was sold at an auction for $93,500. The sale left a deficiency of $142,935.35, representing the final balance plus attorney's fees. Addison paid that amount to Executive pursuant to the guaranty, and Executive assigned its rights under the lease to Addison. Addison then brought this action against Burnett to recover both the deficiency amount and the installment payments he had made on Burnett's behalf.

At trial, after Addison rested, Burnett moved for nonsuit on the ground that the purported lease was in fact a disguised security agreement. All "open-ended" leases such as this one were security agreements, according to Burnett. Because Executive had not complied with the notice provisions of California Uniform Commercial Code section 9504, Burnett argued, it had waived its rights to the deficiency when it sold the vehicle, and Addison, as the assignee of Executive's interest in the lease, likewise was barred from relief.

After a hearing outside the presence of the jury, the trial court denied the motion. Relying on *Triple C. Leasing* v. *All-American Mobile Wash* (1976) 64 Cal.App.3d 244 [134 Cal.Rptr. 328], the court found that the objective intent of Burnett and Executive was to create a lease rather than a security interest. At the conclusion of the evidence, the jury found in favor of Addison, and the court entered judgment for $159,788.30, plus prejudgment interest and attorney fees.

---

if the depreciated value of said vehicle exceeds the appraised value, or net sale proceeds realized by Lessor, then in such event, Lessee shall forthwith pay to Lessor an amount equal to the said excess as additional rental."

## Discussion

■ Burnett contends that the trial court erred in construing the contract between Executive and him as a true lease rather than a secured sale.[2] Addison maintains that the terms of the contract unequivocally describe a lease.

Our analysis is directed by the California Uniform Commercial Code provisions governing the identification of leases as distinguished from secured transactions. If the contract at issue gave Executive a secured interest in the Ferrari, then division 9 was applicable and Executive was required to give notice of the sale pursuant to section 9504, subdivision (3).

California Uniform Commercial Code section 9102 states that a secured interest may be created by a lease "intended as security." The distinction between a lease and a secured transaction is addressed in section 1201, subdivision (37)(b) (hereafter, section 1201(37)(b)). Before its amendment in 1988, this section provided: "Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." (Stats. 1963, ch. 819, § 1, p. 1854.)

This statutory reference to the intent of the contracting parties generated a proliferation of decisions in which courts attempted to refine the distinction between leases and security agreements. Many courts relied on a list of several factors that presumably indicated that a particular transaction was intended to be a secured sale rather than a true lease. These indicia included the following: (1) the lessee was granted an option to purchase the product for a nominal price rather than its fair market value; (2) the lessee acquired equity in the property such that the only economically sensible course was to exercise the purchase option; (3) the lessee was to pay for insurance,

---

[2]Alternatively, Burnett suggests the court should have allowed the jury to determine the nature of the agreement in dispute. This suggestion is not only belated, it is inconsistent with the premise of his nonsuit motion—that the court could construe this lease as a matter of law. Furthermore, it is incorrect. The construction of this document was a question of law, since it did not depend on the credibility of extrinsic evidence. (*Metzenbaum* v. *R.O.S. Associates* (1986) 188 Cal.App.3d 202, 212 [232 Cal.Rptr. 741]; cf. *Sharer* v. *Creative Leasing, Inc.* (Ala. 1993) 612 So.2d 1191, 1194; *LMV Leasing, Inc.* v. *Conlin* (Utah App. 1991) 805 P.2d 189, 192.)

licensing fees, sales tax and other taxes, maintenance, and repairs; (4) the lessee assumed the risk of loss or damage; (5) the agreement permitted acceleration of payments or resale upon default; (6) the agreement contained a disclaimer of normal warranties; and (7) the lessor lacked facilities to store or retake the goods. (See, e.g., *Commercial Credit Equipment* v. *Parsons* (Mo.App. 1991) 820 S.W.2d 315, 320; *In re Zaleha* (Bankr.D.C. Idaho 1993) 159 Bankr. 581, 582; *Triple C. Leasing, Inc.* v. *All-American Mobile Wash, supra*, 64 Cal.App.3d at pp. 248-249; *Matter of Tillery* (5th Cir. 1978) 571 F.2d 1361, 1366.)

According to the official comments accompanying the 1988 amendment, the emphasis of the statute on intent "has led to unfortunate results." The numerous factors believed to define secured sales proved unworkable, producing inconsistency and unpredictability among courts characterizing similar transactions. (*Carlson* v. *Giacchetti* (1993) 35 Mass.App. 57 [616 N.E.2d 810, 812].) As the official comments point out, "[m]ost of these criteria . . . are as applicable to true leases as to security interests." Consequently, all but the first two factors were discarded when section 1201(37) was revised. Indeed, paragraph (c) of revised section 1201(37) specifically discourages judicial reliance on these factors.[3]

The Legislature adopted the Uniform Commercial Code revisions to section 1201(37) in 1988. The amendment was made effective January 1, 1990. Although the contract between Executive and Burnett was executed in 1989, before the 1988 amendment took effect, our analysis should be consistent with the current statute, not the pre-1988 version. One of the reasons for the amendment, according to the official comments, was to clarify the confusion engendered by the "vague and outmoded" references to "leases intended as security," thereby "sharpening the line between true leases and security interests." In our view, the amendment was intended to clarify the process of determining the nature of these contracts, not to change the substance of the law. (See *In re Bumgardner* (Bankr.D.C. Idaho 1995)

---

[3]To this end, section 1201(37)(c) specifically cautions that a security interest is *not* created merely because: "(i) The present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into, [¶] (ii) The lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods, [¶] (iii) The lessee has an option to renew the lease or to become the owner of the goods, [¶] (iv) The lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or [¶] (v) The lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed."

183 Bankr. 224, 229; *In re Cole* (Bankr.N.D.Okla. 1990) 114 Bankr. 278, 281; *Carlson* v. *Giacchetti, supra*, 616 N.E.2d at p. 813 [revised provisions "illuminate, but do not alter," meaning of existing 1201(37).]) The discussion that follows will therefore conform to the analysis prescribed by section 1201(37) as amended in 1988.

Section 1201(37)(b) now reads: "Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and [¶] (i) The original term of the lease is equal to or greater than the remaining economic life of the goods, [¶] (ii) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods, [¶] (iii) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or [¶] (iv) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement."

Revised section 1201(37)(b) initially instructs us, as before, to examine the facts of each case in characterizing a transaction. Yet this instruction is immediately qualified by the delineation of circumstances that create a security interest as a matter of law.

These circumstances are captured in a two-part test. First, if the lessee does not have the right to cancel the purported lease prior to the expiration of its term, the parties will be considered to have entered into a security agreement. If, on the other hand, the relationship is terminable by the lessee at any time, the instrument is a true lease.

Second, at least one of the four enumerated conditions must be present. If the lease term extends or may be renewed for the duration of the useful life of the product, or if the lessee may acquire the product for little or no additional consideration, then the lessor is said to have agreed to forgo an economic interest in the goods at the end of the lease term. In such a case, the purported lease will be deemed to be a security agreement. "[A]bsent a concern for the value or expectant return of the goods upon the conclusion of the lease term the lessor, at the inception of the lease, had really formulated no further anticipation of an investment return from the leased goods, an anticipation more historically associated with an intent to transfer a title

interest in the goods . . . . Hence, the need for some form of security." (*In re Zaleha, supra,* 159 Bankr. at p. 585.)

If, on the other hand, none of the enumerated conditions is present, a security interest will not conclusively be found to exist. In such a case, the court must then resort to an examination of the facts of the case to determine whether the lessor has retained a "meaningful residual interest" in the goods. (*In re Zaleha, supra,* 159 Bankr. at p. 585; see also *In re Allen* (Bankr. D.C.Ore. 1994) 174 Bankr. 293, 295 [touchstone of new test is economically significant reversionary interest]; 4 White & Summers, Uniform Commercial Code (4th ed. 1995) § 30-3, pp. 24-25 [lease characterized by meaningful reversionary interest].) If so, a lease will be found. (*Carlson v. Giacchetti, supra,* 616 N.E.2d at p. 813; *Kimco Leasing v. State Bd. of Tax Com'rs* (Ind. 1995) 656 N.E.2d 1208.) As one court explained, "If the lessor retains a meaningful residual interest in the leased property at the end of the lease term, the lease is a true lease. If, however, the lessor cannot reasonably expect to receive back anything of value at the end of the lease, then the lease creates a security interest." (*Kimco Leasing, v. State Bd. of Tax Com'rs, supra,* 656 N.E.2d at p. 1218.)

In this case, the first prong of the test of a security interest is easily met. Burnett did not have the option of terminating the lease until he had completed 36 months of rental payments. The statute then directs us to the four conditions comprising the second step of the test. None of these conditions is satisfied here. First, there is no dispute that the Ferrari retained some useful life beyond the mandatory three years of the lease. Second, Burnett was under no obligation either to renew the lease for the remaining economic life of the car or to purchase it. Third, the contract contained no option either to renew the lease or to purchase the car for nominal additional consideration. Because no security interest could be conclusively presumed according to these factors, we must look to the facts of the case to determine whether Executive, the lessor, relinquished its reversionary interest in the Ferrari under the terms of the agreement.

Two features of a lease must be examined in this light: (1) any option to purchase and (2) any provision for the lessee's acquisition of equity in the goods. As one court explained, "If a lease contains an option to purchase for no or nominal consideration . . . it suggests that the lessor does not care, in an economic sense, whether or not the option is exercised. If the lessee develops equity in the leased property such that the only sensible decision economically for the lessee is to exercise the option . . . it suggests the lessor did not expect the return of the leased goods." (*In re Zaleha, supra,* 159 Bankr. at p. 585; accord; *In re Bumgardner, supra,* 183 Bankr. at p. 228.)

In this case, as noted earlier, the lease did not contain a purchase option at the end of its term. After repossessing the vehicle, Executive did offer Burnett an opportunity to purchase the vehicle, but as the trial court observed, the option price of $255,809.78 was not nominal. Burnett does not contest this finding. Instead, he focuses on the second component of the analysis, contending that the lease gave him equity in the Ferrari by requiring him to bear the risk of gain or loss in value upon the termination of the lease. According to Burnett, "Every court that has ever ruled on this subject" has considered such a provision to denote a security agreement.

Burnett relies on two federal decisions, *Matter of Tillery*, *supra*, 571 F.2d 1361, and *In re Tulsa Port Warehouse Co., Inc.* (10th Cir. 1982) 690 F.2d 809, where the leases in question imposed on the lessee the risk of loss in value upon the mandatory resale of the vehicle. In *Tillery*, the lessee was entitled to terminate the lease after six months, " 'provided that Lessee shall bear any loss or receive any gain which results from final disposition of a vehicle.' " (571 F.2d at p. 1362.) Similarly, in *Tulsa*, the lessee was obligated to return the vehicle to the lessor at the end of the lease term, at which time the lessor was required to sell it. If the price received exceeded the depreciated value, the lessee received the surplus; conversely, if the sale yielded an amount lower than the depreciated value, the lessee was liable for the difference. (690 F.2d at p. 811.)

In both cases, the court found that a secured transaction had taken place. The termination formula, the *Tillery* court reasoned, "recognizes the equity of the [lessee] in the vehicle because he is required to bear the loss or receive the gain from its wholesale disposition." (*In re Tillery*, *supra*, 571 F.2d at p. 1365; accord, *In re Tulsa Port Warehouse Co., Inc.*, *supra*, 690 F.2d at p. 811.)

Burnett exaggerates the extent to which this view is shared by other courts. In *Sharer* v. *Creative Leasing, Inc.*, *supra*, 612 So.2d 1191, for example, the Alabama Supreme Court expressly disagreed with the *Tillery* court's assumption that termination clauses requiring the lessee to assume the risk of gain or loss in value confer an ownership interest on the lessee. "Viewed as to its economic function, such a termination clause does not represent an equity in the vehicle, but a shifting of the risk that the actual value of the leased vehicle at the time the lease is terminated . . . . We do not agree that the resulting loss or gain to the lessee necessarily represents an 'equity' in the property." (*Id.* at p. 1195.) Thus, the *Sharer* court concluded, ". . . it cannot be said that such a shifting of the risk of loss in value of the item alone is sufficient to hold that any lease agreement containing such a clause necessarily was intended to create a security interest." (*Id.* at p. 1196.)

We need not express an opinion as to the correctness of either the result in *Tillery* and *Tulsa* or the opposing view expressed in *Sharer*, because, contrary to Burnett's representation, the lease in this case does not contain "identical provisions." In both *Tillery* and *Tulsa*, the lessor was *required* to sell the vehicle.[4] The lessor thus could legitimately be said to have surrendered any residual interest in the goods, and the lessee could be deemed to have acquired an equitable ownership interest. As one court observed, "from the moment the agreement was signed [in *Tulsa*], lessor . . . lost any reversionary interest in the property itself, any expectancy that some day he might 'do as he pleases with' it." (*In re Breece* (Bankr.N.D.Okla. 1986) 58 Bankr. 379, 385 [as in *Tulsa*, lease obligated lessor to sell vehicle].) In this case, however, the lessor retained the "sole and exclusive option" to appraise or dispose of the Ferrari. Executive was under no obligation to sell the car; it could "in its sole discretion" appraise the vehicle, sell it, or do neither.

In *Keeling* v. *Ford Motor Credit* (1988) 314 Md. 311 [550 A.2d 932], the appellate court drew a similar distinction. The lease in *Keeling permitted* the lessor to sell the vehicle if the lessee defaulted; but since the lease did not provide for permanent transfer of ownership to the lessee, it was not a secured sale. The court thus distinguished the facts before it from those of *Tillery* and *Tulsa*, where "the vehicle did not revert to the permanent possession of the lessor" and the lessee therefore acquired equitable ownership. (*Id.* at p. 941; see also *Brown Motors Leasing* v. *Reucher* (1992) 80 Ohio App.3d 225 [608 N.E.2d 1162, 1165] [among factors indicating true lease, lessor under no obligation to dispose of vehicle at end of lease]; *Carlson* v. *Giacchetti, supra,* 616 N.E.2d at p. 814 [lessor reserved economically significant reversionary interest where lessee obligated to return equipment with resale value, compelling finding of true lease].)

Burnett maintains that "all open ended [*sic*] lease [*sic*] are in fact security agreements." He mistakenly assumes, however, that the contract at issue is an open-end lease. ■ An open-end lease calls for "reciprocal obligations to continue after expiration of the fixed term. . . . After termination, lessee would return the vehicle to lessor; lessor [would] then [be] required to sell it, to apply the proceeds against the amount of lessee's remaining liability, and to account to lessee for any difference between the sale proceeds and the

---

[4] In *Tillery*, for example, the lease provided: " 'When a vehicle is returned to Lessor upon such . . . termination or expiration hereof, Lessor *shall* promptly obtain and accept the highest available cash offer at wholesale for the vehicle and notify Lessee in writing of the gain or loss computed pursuant to this paragraph.' " (571 F.2d at pp. 1362-1363, italics added.)

amount of lessee's remaining liability."[5] (*In re Breece, supra,* 58 B.R. at pp. 384-385.) ▮ Here, although the agreement is denominated an "open-end lease," the lessor nonetheless retains a reversionary interest. If Executive were to elect to dispose of the vehicle, some accounting would have to be made between the parties to settle the difference between its appraised value or sale price and its depreciated value;[6] but by granting Executive that choice, the contract preserved Executive's right to do whatever it wished with the car upon its return. This was not an open-end lease.

The remaining terms of this document support its construction as a true lease. Paragraph 13 expressly states that the vehicle is "the sole property of Lessor, and Lessee shall have no right, title or interest therein as to the ownership thereof . . . and this instrument is a lease and not a contract of sale." Moreover, at trial Burnett testified that he understood that he was signing a lease. He also acknowledged that he was bound by its terms even though he signed without reading it.

We would reach the same result by examining the instrument under former section 1201(37), as did the trial court. The intent expressed in this agreement is clearly to enter into a lessor-lessee relationship, not a secured sale. Executive did not grant Burnett an option to purchase the Ferrari for no or nominal additional consideration, the only statutory criterion defining a security interest as a matter of law. Nor is there any implicit provision for transfer of ownership in the agreement. Any question as to Burnett's subjective intent in executing the contract was immaterial, since a proper analysis is based not on the parties' private motives but on their objective intent as expressed in the language of the instrument. (See *Carlson* v. *Giacchetti, supra,* 616 N.E.2d at p. 812; *LMV Leasing, Inc.* v. *Conlin, supra,* 805 P.2d 189, 192.) The remaining factors Burnett cites to support a characterization as a security agreement—his payment of sales tax, insurance, licensing and registration fees, as well as his assumption of the risk of loss or damage—are no longer considered controlling. (§ 1201(37)(c); *In re Bumgardner, supra,* 183 Bankr. at pp. 228-229; *Kimco Leasing* v. *State Bd. of Tax Com'rs, supra,* 656 N.E.2d at p. 1218, fn. 15.)

In summary, on the facts before us we can only conclude that the parties entered into a lease rather than a security agreement. The provisions of division 9 of the California Uniform Commercial Code therefore did not apply to this transaction, and the trial court properly denied Burnett's motion for nonsuit.

---

[5]In contradistinction, a closed-end lease terminates the obligations of both parties upon return of the goods. (*In re Tulsa Port Warehouse Co., Inc., supra,* 690 F.2d at p. 810, fn. 1.)

[6]The "depreciated value" was to be determined by a formula applied to the "original value" stated on the contract.

## Disposition

The judgment and postjudgment order awarding attorney fees are affirmed.

Premo, Acting P. J., and Mihara, J., concurred.